UNITED STATES, Appellee

v.

Larry R. LONGSTREATH, Gunner's
Mate Second Class, U.S. Navy,
Appellant.

No. 95–1120.
Crim.App. No. 91–0744.

U.S. Court of Appeals for
the Armed Forces.

Argued June 5, 1996.

Decided Sept. 30, 1996.

For Appellant: *Lieutenant Gerard Wm. Wittstadt, Jr.,* JAGC, USNR (argued).

For Appellee: *Lieutenant David M. Harrison,* JAGC, USNR (argued); *Colonel Charles Wm. Dorman,* USMC, and *Commander David H. Myers,* JAGC, USN (on brief).

*Opinion of the Court*

GIERKE, Judge:

Appellant was charged with rape, carnal knowledge, sodomy, committing indecent acts with AL, his stepdaughter (10 specifications), committing indecent acts with CL, his natural daughter, and committing indecent acts with SL, also his natural daughter, in violation of Articles 120, 125, and 134, Uniform Code of Military Justice, 10 USC §§ 920, 925, and 934, respectively. The military judge granted a defense motion for findings of not guilty of the rape, carnal knowledge, sodomy, and nine of the specifications of committing indecent acts with AL.[1] He also granted a defense motion to dismiss the specification of committing indecent acts with CL, on the ground that prosecution was barred by the statute of limitations.

Sitting as a general court-martial at Naval Station, San Diego, California, the military judge convicted appellant, contrary to his pleas, of committing indecent acts with AL (2 specifications) and committing indecent acts with SL. The adjudged and approved sentence provides for a dishonorable discharge, confinement for 6 years, total forfeitures, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed the findings and sentence. 42 MJ 806 (1995).

Our Court granted review of the following issues:

I

WHETHER APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WHEN THE CHILD WITNESSES WERE PERMITTED, AT TRIAL, TO TESTIFY AGAINST APPELLANT VIA ONE–WAY CLOSED CIRCUIT TELEVISION.

II

WHETHER THE NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN IT FOUND THAT THE MILITARY JUDGE DID NOT ABUSE HIS DISCRETION WHEN HE FAILED TO STRIKE THE ENTIRE TESTIMONY OF [AL] WHEN SHE PREMATURELY TERMINATED CROSS–EXAMINATION BY REFUSING TO ANSWER FURTHER QUESTIONS, EVEN THOUGH SHE WAS TESTIFYING VIA ONE–WAY CLOSED CIRCUIT TELEVISION.

*Factual Background*

This was appellant's second general court-martial for sexually abusing his children. In July 1987 a general court-martial convicted him of carnal knowledge, sodomy, and taking

---

1. While defense counsel made a "motion for a finding of not guilty" as to all of these offenses (R. 665), the military judge granted "the motion" as to the indecent-acts specifications, but he granted what he referred to as "the motion to dismiss" the rape, carnal knowledge, and sodomy specifications. (R. 668.) We consider that the judge's action in granting "the motion to dismiss" had the same legal effect as if he had granted a motion for a finding of not guilty.

indecent liberties with AL. The court-martial sentenced him to confinement for 90 days, reduction to pay grade E–5, and a reprimand.

Appellant was released from confinement in October 1987 and transferred to San Diego, California. In April 1988, AL, CL, and SL were placed in the custody of the county but permitted to reside with their mother if appellant removed himself from the family home. Appellant was prohibited from any contact with the children other than supervised visits. 42 MJ at 811.

In November 1988 AL entered a psychiatric hospital. After 2 months, she transferred to a residential treatment center where she told her counselor that appellant had returned to the family home, in violation of the court order, and molested her. Appellant's second court-martial, the subject of this appeal, resulted from AL's report and the subsequent investigation. 42 MJ at 811.

Appellant's second court-martial began in December 1990. At that time, AL was 16 years old, CL was 10, and SL was 2. 42 MJ at 811. The indecent acts with AL alleged in specification 1 of Charge III were alleged to have occurred 2½ years earlier, during the summer of 1988. All other offenses were alleged to have occurred at divers times between October 1987 and April 1989.

SL did not testify. CL testified via one-way closed-circuit television. AL was called to the witness stand in open court, but after three sessions where she was unresponsive and emotional, the military judge permitted her also to testify via closed-circuit television.

In support of its request that CL testify through closed-circuit television, the Government presented the testimony of Dr. Miccio–Fonseca, a clinical psychologist who had treated CL since July 1989. Dr. Miccio–Fonseca testified that CL is "very guarded, very defensive, somewhat paranoid." She stated that testifying "would be very, very dramatic for her, and I think we'd see serious psychological regressions for [CL]. And I think that the gains we've made psychologically would probably be aborted with her coming in here and testifying." Dr. Miccio–Fonseca testified that CL's symptoms "are still manifested in terms of the anuresis, the bed-wetting; the encopresis which is defecating in pants; the nightmares, the sleeping disturbances, the eating disturbances, the inability to concentrate and pay attention, the daydreaming that she manifests." Dr. Miccio–Fonseca further testified that she did not think CL would be able to speak in the courtroom in appellant's presence because she is "terrified" of him.

On cross-examination, Dr. Miccio–Fonseca was asked if she was "completely sure" that CL would be damaged by testifying in appellant's presence. She responded, "Oh, I think I'd probably make a sizeable bet on it."

The military judge asked Dr. Miccio–Fonseca to describe the psychological consequences of CL testifying in the presence of appellant. She responded, "I think that she would probably have more nightmares, become more anuretic, more encopretic, have more difficulty in concentrating and attending to stimuli. I think that she'd become more emotionally constricted and isolated."

The military judge granted the Government's motion to permit CL to testify by one-way closed-circuit television out of appellant's presence. He explained:

I consider the age of the witnesses to be a very significant factor in my decision here. In the case of the 10 year old, [CL], I find that based on the evidence the government has convinced me that she would suffer serious psychological consequences as a result of having to testify in the presence of Petty Officer Longstreath. That, of course, is based on the testimony of Dr. Miccio–Fonseca. But I believe they have met their burden in that regard and I will grant the government's motion as to [CL].

CL testified from the deliberation room and was visible and audible in the courtroom on an 18–inch color television. Members of the prosecution and the defense were seated in the deliberation room while CL testified. Other members of the prosecution and defense teams remained in the courtroom. Two telephone lines were installed. One was a direct line between the defense table in the

courtroom and the defense counsel in the deliberation room. The second line was between the military judge, who remained in the courtroom, and the counsel for both sides seated in the deliberation room.

CL testified that she saw appellant "put his finger in [SL]'s vagina" while changing her diaper. She testified that she also watched her mother change SL's diapers. Asked what was different about the way appellant changed SL's diapers, CL testified, "My mommy doesn't stick her finger up—in [SL]'s vagina."

CL did not mention seeing appellant tie AL to the bed. Dr. Miccio–Fonseca testified, however, that the first time CL visited her CL drew a picture of AL tied to a bed and crying, with appellant standing next to the bed. Dr. Miccio–Fonseca testified that CL told her that the drawing was "about her father molesting her oldest sister, [AL]."

The Government requested that AL be permitted to testify outside appellant's presence. AL had been called as a witness on January 10 but was unresponsive and emotional. The military judge initially denied the request, but after AL testified the military judge described her first appearance as a witness as follows:

> I'll state right up front that on this motion I will consider the apparent reluctance of the witness to enter the courtroom to begin with. I will consider the need for trial counsel to go to great lengths to talk her into the courtroom. I will consider her demeanor when she was testifying which appeared to the court to be one of an individual who was severely—or extremely reluctant to be here to begin with. She would take an enormously long period of time between questions. Some of her answers she did not give out even though they were one word answers. Simple responses were two to three minutes. She had to be, if not asked leading questions, then she had to be coaxed throughout the testimony. She had her hair arranged in such a fashion that she could not see off to her left which is where the accused is sitting. Never once did she look in that direction. She broke down crying on at least two occasions in response to questions by the trial counsel, actually shedding tears. We had to call at least two recesses during her testimony. It took two hours to elicit very little information from her. So it's apparent to the court that the witness was having a great deal of difficulty testifying in this case

> Now the court is not convinced that this was because of the presence of the accused. She said that it was in response to a leading question or two, but I'm not convinced that she was simply uncomfortable with the testimony or process per se.

On the following day, trial counsel requested a continuance because the Government could not persuade AL to return to the courtroom. The military judge granted the request. The court-martial resumed on January 18, 1991. AL testified concerning the allegation of indecent acts by fondling her breasts, alleged in specification 1 of Charge III and referred to by the parties as the "Melrose" incident. By a lengthy process of coaxing and leading questions, trial counsel elicited testimony that appellant came up behind her while she was washing dishes in the kitchen sink and touched her breasts. AL then became unresponsive and the military judge granted trial counsel's request for a recess.

When the court reconvened the military judge directed the court reporter to show the time lapse between questions directed to AL and her answers. He explained, "During our last session, for example, several of the answers came after 30 or more seconds had gone by from the asking of the question by trial counsel."

AL continued testifying and described appellant coming into her bedroom at night, carrying her to his bedroom, removing her clothing, tying her to the bed, and using a belt from his bathrobe and some of her mother's lingerie. AL cried throughout her testimony. She testified that, after tying her hands to the bedpost, appellant had sexual intercourse with her. She testified that appellant then untied her and performed anal sodomy on her. She testified that there were three other incidents of sexual abuse

while they lived in the Philippines. At this point, AL again became unresponsive and the military judge granted a 10–minute recess.

When the court reconvened, AL described further acts of intercourse and sodomy. She reluctantly described an incident where appellant inserted a vibrator into her vagina. When trial counsel asked AL if appellant placed anything other than his penis and the vibrator into her vagina, AL began crying and became unresponsive. [This question apparently was directed toward specification 9 of Charge III, alleging that appellant inserted a vibrator, banana, and carrots into her vagina.] Trial counsel suggested another recess. After a 21–minute recess, AL described a second incident where appellant fondled her breasts.

Defense counsel then cross-examined AL at length about the "Melrose" incident. He then said, "Let's talk about the incident you testified to in the Philippines," apparently referring to AL's direct testimony about being tied to the bed. After being asked several times to "tell us again what happened," AL would not respond and started crying.

After another recess defense counsel cross-examined AL about the incident with the vibrator. She responded twice that appellant "put it in my vagina." After she was asked a third time "what happened," she began crying and the military judge recessed the court.

When the court reconvened, defense counsel told AL, "I want to talk about the first incident in the Philippines that you testified to. Tell us what happened that day from the time you walked in your home until the time that you testified to before on direct examination." After two pages of questioning in which she responded only with "I don't know" and "I don't remember," the military judge asked AL, "[D]o you understand what the question is?" She responded that she did. The military judge then asked whether she was able to answer it, and she responded, "No." The military judge recessed the court.

When the court-martial reconvened five days later, AL refused to answer defense counsel's questions. Defense counsel then moved to strike AL's testimony in its entirety. The military judge took the motion under advisement and recessed the court overnight.

When the court-martial reconvened on January 24, the military judge informed the parties that he was willing to reconsider his ruling on the Government's request that AL be permitted to testify outside appellant's presence. He explained:

After hearing her testify on three occasions both on direct and cross-examination, on the 9th of January, the 18th of January and the 23d of January and in reviewing what transpired on each of those occasions, it's obvious to me that the witness was traumatized by these proceedings. On each of those occasions she demonstrated a reluctance to testify, in fact, a frightened demeanor. She broke out in tears on several occasions—numerous occasions. She physically trembled. At times, she entered into a trance-like state in response to questions by, even the government counsel. . . .

There was no difference in her behavior between direct and cross-examination that I could discern. She was equally traumatized by both experiences and it was only because the government counsel was allowed to use extensive leading type questions that they got anywhere with the witness. Had they framed the questions strictly as those calling for narratives, as the defense did, on cross-examination, then they would have been as equally unsuccessful.

Now I bore in mind that we heard no expert testimony on the issue of whether or not the witness would be traumatized to the point where she could not communicate as we did here concerning [CL]; however, my understanding of case law is that expert testimony is not required when, in fact, we are were [sic] treated—or should I say, exposed to the actual traumatization before our very eyes.

After defense counsel protested that AL's reluctance to testify arose from the subject matter of her testimony rather than appel-

lant's presence, the military judge explained further:

All right. Again, let me make some things clear for the record.

Again, I saw no difference in her reaction to questions on direct from those on cross so, in my view, the trauma she experienced was the same in both settings.

I would like to call the attention of the defense to her testimony back on the 8th of January. The first time she was asked to get into the details relating to the offense she was very reluctant to talk about it, in fact, she said, "I don't want to talk about it." This was on direct-examination. A few moments later she talked about being nervous while on the stand now, but, while in Lieutenant Sulik's [the trial counsel] office, she was not nervous. The difference there being that in her words "he's here" meaning, the accused. She went on to say, "It would be easier if Larry was not here." Although these were leading questions, she did go on to say, "I can't talk in front of Larry." "As to why I can't talk in front of Larry, I feel uncomfortable being near him." As to what would happen if Larry was not present, "I would be able to talk to you about these things." "I'm uncomfortable around Larry. I would not be uncomfortable if Larry was not present and by uncomfortable, I mean, nervous."

Based on that testimony from the witness and her obvious trauma, as we've indicated we found earlier, I've come to the conclusion that it is the presence of the accused that creates the problem and I'm going to grant the government's motion.

Trial counsel informed the military judge that she had completed her direct examination. Accordingly, AL's testimony via closed-circuit television began with cross-examination by defense counsel.

Defense counsel began cross-examination by saying, "Let's talk about Melrose." Detailed questioning about appellant's conduct and the surrounding circumstances followed. Defense counsel then asked if there was a second fondling incident, but AL would not answer. After the question was repeated several times to no avail, the military judge excused the witness and convened an Article 39(a), UCMJ, 10 USC § 839(a), session. Defense counsel requested that the military judge strike all of AL's direct testimony.

After some discussion of trial counsel's accusation that defense counsel intentionally intimidated AL by raising his voice, the military judge said, "Let's just continue and see what happens." Cross-examination resumed with defense counsel saying, "[L]et's go back and talk about Melrose again." He asked two questions: "what color was the kitchen in Melrose" and "how many dishes were in the sink?" AL responded to both by saying, "I don't know." Defense counsel then said, "[L]et's talk next about the second time you say your father fondled your breasts." AL sat silently after each question about the "second time." Defense counsel renewed his motion to strike AL's testimony. The military judge granted the defense motion in part, but denied the defense motion regarding the "Melrose" incident, observing that it "was explored to a reasonable degree by the defense on cross-examination."

### Televised Testimony (Issue I)

Appellant asserts that using televised testimony of CL and AL violated his right to face-to-face confrontation. He argues that the military judge failed to make the proper findings of necessity before permitting AL and CL to testify via one-way closed-circuit television. Finally, he argues that using one-way closed-circuit television violated 18 USC § 3509 because the statute provides for two-way closed-circuit television in child-abuse cases.

The Government asserts that the absence of procedural rules in the Manual for Courts–Martial, United States (1995 ed.), did not preclude use of televised testimony. Government counsel argue that the military judge properly found that AL and CL would be traumatized by testifying in appellant's presence and were unable to testify in appellant's presence. We hold that the military judge did not err by permitting AL and CL to testify via one-way closed-circuit television outside appellant's presence.

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The Supreme Court has held that this right of confrontation includes literal face-to-face confrontation. *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).

However, 2 years after the Supreme Court decided *Coy,* it held that the face-to-face requirement is not absolute and may be abridged when necessary to further an important public policy, provided that the testimony's reliability is otherwise assured. *Maryland v. Craig,* 497 U.S. 836, 857, 110 S.Ct. 3157, 3169, 111 L.Ed.2d 666 (1990). The Supreme Court held that the Confrontation Clause was satisfied in cases involving child victims where: (1) there was a case-specific finding that testimony by the child in the presence of the defendant would cause the child to suffer serious emotional distress such that the child could not reasonably communicate; (2) the impact on the child would be "more than *de minimis*"; (3) the child testified via one-way closed-circuit television, enabling the judge, jury, and defendant to observe the child's demeanor during testimony; and (4) the child was subject to full cross-examination. *Id.* at 856–57, 110 S.Ct. at 3169–70.

After *Craig,* Congress enacted the Comprehensive Crime Control Act of 1990. Pub. L.No. 101–647, 104 Stat. 4789. Title II, Subtitle D, § 225 of the Act, codified in 18 USC § 3509, authorizes federal courts to order two-way closed-circuit testimony in child-abuse cases. The Act appears to be directed toward trials in federal district courts, because it refers to the Federal Rules of Criminal Procedure and the Federal Rules of Evidence. 18 USC § 3509(f) & (c)(1). Nevertheless, the legislative history of the Act reflects congressional intent to protect children "who enter the Federal system (through military bases, Indian reservations and from other Federal lands and facilities)." House Report No. 681(I) at 166,

*reprinted in* 1990 U.S.Code Cong. & Admin.News 6572.[2] Whether Congress intended the Act to apply to courts-martial, or only to cases in federal district courts arising from federal enclaves, is not clear. The court below held that "the provisions of the 1990 Act, as codified in 18 USC § 3509, are applicable and provide guidance for us." 42 MJ at 815.

■ Appellant argues that use of one-way television violates 18 USC § 3509. His argument is premised on applicability of the statute to courts-martial. We need not and do not decide if 18 USC § 3509 applies to courts-martial. While most of the provisions of the statute use the mandatory term "shall," the provisions for two-way television and videotaped depositions use the permissive term "may." Thus, the statute allows use of two-way closed-circuit television but does not mandate it. It also authorizes videotaped depositions taken without the accused's presence, a means offering even less confrontation rights than the one-way television used in appellant's case. *Maryland v. Craig, supra,* upheld use of one-way closed-circuit television. Therefore, even if the statute does apply to appellant's case, use of one-way closed-circuit television violates neither the statute nor the Confrontation Clause if the requirements of *Maryland v. Craig, supra,* are otherwise met.

Our Court has permitted various limits on face-to-face confrontation. In *United States v. Thompson,* 31 MJ 168 (1990), our Court held that an accused's right to confrontation was not violated by allowing his two sons to testify with their backs to him, while facing the military judge and counsel. Likewise, in *United States v. Williams,* 37 MJ 289 (1993), our Court held that the Confrontation Clause was not violated by allowing an accused's 10–year–old daughter to testify from a chair in the center of the courtroom, where the accused could see her full profile but was not able to look into her eyes as she testified. Following *Craig,* our Court held in *Williams:* "Where the placement of a witness prevents face-to-face con-

---

**2.** House Report No. 681(I) refers to "Title XX" of the Act when discussing what became 18 USC § 3509. When the Act was passed, however, the language of now § 3509 had been transferred to Title II, Subtitle D, § 225, of the Act.

frontation to protect the welfare of a child victim who is a witness in the case, there must be a case-specific finding of necessity by the military judge." 37 MJ at 290.

Finally, in *United States v. Daulton*, 45 MJ 212 (1996), we held that the military judge went too far when he excluded the accused from the courtroom and did not make adequate provision for the accused to communicate with his counsel. In *Daulton*, the child testified in the courtroom, with the accused watching her testimony from outside the courtroom via closed-circuit television. To communicate with his counsel, Daulton was required to send messages through the bailiff. In a split opinion, with Judges Sullivan and Crawford dissenting, we held that excluding the accused from the courtroom violated the Sixth Amendment; Article 39(b); and RCM 804, Manual, *supra*. *Daulton*, 45 MJ at 219.

■ The determination of necessity for abridging the requirement for face-to-face confrontation is a question of fact. Accordingly, the military judge's finding of necessity will not be reversed unless it is clearly erroneous or unsupported by the record. *United States v. Carrier*, 9 F.3d 867, 870–71 (10th Cir.1993).

Turning to the specifics of this case, we hold that the military judge made a proper finding of necessity for CL's testimony out of appellant's presence. Dr. Miccio–Fonseca testified that CL would suffer "serious psychological regressions," that CL was "terrified" of appellant, and that she probably would be unable to talk in appellant's presence. While the military judge did not expressly find that CL would be unable to testify in appellant's presence, he stated that he accepted Dr. Miccio–Fonseca's testimony completely, thereby adopting her findings as his own, including her conclusion that CL would be unable to testify in appellant's presence. *See United States v. Quintero*, 21 F.3d 885, 892 (9th Cir.1994), quoting *United States v. Garcia*, 7 F.3d 885, 889 n. 1 (9th Cir.1993) (finding that "resulting emotional trauma would also prevent the witness from giving meaningful testimony" was "implicit" in find-

ing that child would suffer emotional trauma from testifying.).

Concerning AL, the record amply supports the military judge's findings that she was traumatized by repeated attempts to make her testify in appellant's presence and that she was unable to do so. It does not take an expert to conclude that a witness who trembles and cries on the witness stand is "traumatized." *Maryland v. Craig, supra*, is silent on the question whether this "case-specific finding of necessity" must be based on expert testimony. In cases where 18 USC § 3509 is applicable, expert testimony is not required where the child's behavior while attempting to testify demonstrates trauma. *See* H.R. Rep. 681(I) at 168, *reprinted in* 1990 U.S.Code Cong. & Admin.News 6574 ("[O]nce the trial has begun, the court may judge with its own eyes whether the child is suffering the trauma required to grant the requested order."). AL's demeanor while attempting to testify in appellant's presence and her specific statements that she was "uncomfortable" testifying in appellant's presence fully support the military judge's finding that AL's inability to respond to questions was due to appellant's presence.

### Motion to Strike Testimony (Issue II)

Appellant contends that the military judge abused his discretion by refusing to strike all of AL's testimony after she refused to continue answering questions during cross-examination. He also contends that the military judge improperly considered AL's testimony regarding specification 2 of Charge III (tying AL to a bed) after striking her testimony regarding that incident. The Government argues that the military judge did not abuse his discretion by refusing to strike those portions of AL's testimony pertaining to the "Melrose" incident because appellant had an opportunity for effective cross-examination.

■ The Confrontation Clause guarantees more than "being allowed to confront the witness physically"; it guarantees an opportunity for effective cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974). The op-

portunity for effective cross-examination, however, does not extend to "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985).

■ Mil.R.Evid. 301(f)(2), Manual, *supra*, authorizes a military judge to "strike the direct testimony of the witness in whole or in part" if a witness asserts the privilege against self-incrimination on cross-examination. The military judge has discretion to determine to what extent a witness' testimony will be stricken. The rule "anticipates that a military judge to whom such a motion to strike is made will approach a ruling with some sensitivity to determining what if any remedy is necessary to achieve fairness and justice through the adversary system." *United States v. Moore*, 36 MJ 329, 334 (CMA 1993). Consequently, the military judge's ruling will be reviewed for abuse of discretion. *See United States v. Gary*, 74 F.3d 304, 309–10 (1st Cir.1996); *Rice v. Wood*, 44 F.3d 1396, 1403 (9th Cir.1995); *United States v. Berrio–Londono*, 946 F.2d 158, 160 (1st Cir.1991); *United States ex rel. Ashford v. Director, Illinois Department of Corrections*, 871 F.2d 680 (7th Cir.1989); *United States v. Cameron*, 814 F.2d 403, 406 (7th Cir.1987). The rules of evidence do not specifically address the situation before us, where a witness sat silently and was unwilling or unable to answer but did not claim a privilege. Nevertheless, the same standard of review applies because the fundamental issue remains the same: whether striking all or part of the testimony is necessary to preserve an accused's right of confrontation.

■ If a witness is unable to answer, the right of confrontation may be satisfied. *See United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (witness unable to answer questions on cross-examination because of memory loss); *Delaware v. Fensterer, supra* (expert witness unable to remember basis for opinion); *Vasquez v. Lockhart*, 867 F.2d 1056 (8th Cir.1988) (80–year–old, hearing-impaired witness gives unresponsive answers to cross-examination). If a witness is able but unwilling to answer questions on cross-examination, the principles underlying Mil.R.Evid. 301(f)(2) apply, because the effect is to unreasonably limit an accused's right of cross-examination. *See United States v. Colon–Atienza*, 22 USCMA 399, 47 CMR 336 (1973); *United States v. Cardillo*, 316 F.2d 606 (2d Cir.1963).

■ Assuming without deciding that AL was able but unwilling to respond to cross-examination, we hold that the military judge did not abuse his discretion by refusing to strike the portion of AL's direct testimony concerning the "Melrose" incident. The record shows that defense counsel began his cross-examination by saying, "Let's talk about Melrose." AL answered all questions until defense counsel moved to a new topic and asked if there was a second fondling incident, at which point she stopped answering. When defense counsel resumed cross-examination by saying, "Let's go back and talk about Melrose again," AL answered. When defense counsel said, "let's talk about the second time" she again became silent. Although defense counsel argued against the military judge's refusal to strike her "Melrose" testimony, he did not identify any subjects he desired to pursue further about the "Melrose" incident, either at trial or on appeal. Accordingly, we conclude that the record does not support appellant's claim that he was denied an opportunity for effective cross-examination concerning the "Melrose" incident.

■ Finally, we turn to appellant's claim that the military judge improperly considered AL's testimony when he convicted him of specification 2, Charge III (tying AL to a bed). A military judge is "presumed to know the law and to act according to it." *United States v. Prevatte*, 40 MJ 396, 398 (CMA 1994). In the absence of evidence to the contrary, we will presume that the military judge did not consider testimony he struck.

*Decision*

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.

Chief Judge COX, and Judges SULLIVAN, CRAWFORD, and ANDERSON [3] concur.

3. Judge G. Ross Anderson, Jr., of the United States District Court for the District of South Carolina, sitting by designation pursuant to Article 142(f), Uniform Code of Military Justice, 10 USC § 942(f).