UNITED STATES

v.

**Daud A. SHABAZZ, Private First Class (E–2), U.S. Marine Corps.**

**NMCM 98 00309.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 24 March 1997.

Decided 5 Nov. 1999.

LT Dale O. Harris, JAGC, USNR, Appellate Defense Counsel.

LT Timothy E. Curley, JAGC, USNR, Appellate Government Counsel.

Before DeCICCO, Chief Judge, TROIDL, Senior Judge, and ANDERSON, Appellate Military Judge.

TROIDL, Senior Judge:

A military judge sitting as a general court-martial convicted the appellant, contrary to his pleas, of wrongful distribution of marijuana and maiming, in violation of Articles 112a and 124, Uniform Code of Military Justice, 10 U.S.C. §§ 912a and 924 (1994).[1] The adjudged sentence includes a dishonorable discharge, seven years confinement, total forfeitures, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged.

We have carefully considered the record of trial, the appellant's assignments of error, his petition for a new trial, the Government's responses, and the outstanding oral arguments of appellate counsel. Finding that error materially prejudicial to the substantial rights of the appellant was committed, we take corrective action in our decretal paragraph. Arts. 59(a) and 66(c), UCMJ.

### Background

On 28 May 1995, Phillip Howard, Carlos Hall, Richard Lewis, and David Coleman, all civilians employed by American Engineering Company in Okinawa, Japan, went out for

---

1. Following arraignment, the military judge granted the appellant's motion to dismiss two specifications of aggravated assault as being multiplicious with the maiming charge. The appellant was acquitted of conspiracy to commit aggravated assault, two other marijuana distribution specifications, breach of the peace, and an assault consummated by a battery.

the evening in Okinawa. Sometime after midnight, they stopped at a club called 8–Beats. The appellant was already inside. The four men walked up a set of stairs to enter the club and then decided to go elsewhere. After descending the stairs, one of the four closed the door to the club, which automatically locked and would not open from either side. A bouncer who worked at the club, J.J. Henderson, arrived on the scene, determined that the door was locked, and asked another employee to unlock it while calling Hall a disparaging name. After the door was unlocked, Hall complained to Henderson about the disparaging name and a verbal altercation ensued. Hall was joined by his friend Howard, who suggested that they beat up Henderson. No physical fight broke out at that point. Henderson eventually went back upstairs and into the club, where he summoned several other men, including the appellant, to follow him outside. A bouncer named Art, who was also working at the club and knew one or more of the four civilians, came downstairs a few moments later. Art told the four men that Henderson was upstairs gathering others to assault them and suggested that they leave the area.

While Coleman and Art talked, Howard, Hall, and Lewis started walking back toward their car. Howard and Hall walked together, while Lewis traveled toward the parking lot via another route. As Howard and Hall approached the parking lot, they heard footsteps and voices behind them. Looking back, they saw a group of five to ten men, including the appellant, pursuing them. The appellant and Henderson were at the head of the group. Howard and Hall turned to face the group and, while walking backwards toward their car, put their hands up and stated that they did not want any trouble. As Howard and Hall continued walking backwards toward their car, Howard slipped and fell, his wallet falling to the ground. At that point, Henderson and one other individual punched Hall, while other members of the group started to beat Howard. Hall was then pinned up against a vending machine

and was struck several more times. Striking back, Hall was able to break free and run from the scene. In the meantime, seeing the group of individuals confronting Howard and Hall, Lewis ran away and hid.

While Hall was being pursued by an unknown number of men from the group, Howard was still on the ground and was being punched and kicked in the head and body by other members of the group. Mala White, the civilian spouse of an active duty Marine who happened upon the scene, hollered to the group that she was going to notify the Japanese police and then did so. When she returned with the police, the group dispersed and ran. Howard lay on the ground unconscious, in a puddle of blood, and suffered brain injuries as a result of the beating. Mrs. White subsequently identified the appellant as one of the individuals who kicked Howard in the head.

Although the appellant was identified as a suspect shortly after the event, the Government was not prepared to bring charges against him until sometime in mid–1996. Mrs. White left Okinawa in mid–1996, returning to the United States with her husband due to his military transfer. When the appellant became one of the subjects in an investigation into drug distribution and black marketing activities in Okinawa, there was a further delay in his case.

On 27 October 1996, the Deputy Assistant Director for Criminal Investigations for the Naval Criminal Investigative Service [NCIS] submitted a request for permission to conduct consensual oral and wire interceptions using Private [Pvt] Escobar, an NCIS cooperating witness.[2] The appellant was listed as one of the targets of the requested interceptions and "MCB Okinawa" appeared next to the heading "Intercept locations." The request was approved on 29 October 1996, and was valid for a 60–day period.

On 18 November 1996, Pvt Escobar visited the appellant at his off-base apartment. Pvt Escobar was wearing a wire that recorded

---

2.  The request was submitted to the Navy General Counsel pursuant to Department of Defense Directive 5505.9, Interception of Wire, Electronic, and Oral Communications for Law Enforcement, of 20 April 1995. The Secretary of the Navy delegated the authority to approve or deny such a request to the Principal Deputy General Counsel by letter dated 26 October 1993.

the conversation between himself and the appellant that evening. Prior to Pvt Escobar's entry into the appellant's apartment, NCIS searched him to ensure he did not possess any drugs. During their meeting, the appellant gave Pvt Escobar an envelope, and they discussed Pvt Escobar selling the contents of the envelope for $400. Pvt Escobar was to deliver $200 of the proceeds to the appellant and keep any remaining funds for himself. It was clear from the words and context of the conversation that the envelope contained marijuana. After leaving the appellant's apartment, Pvt Escobar entered the vehicle of an NCIS agent and delivered the envelope to the agent. Laboratory analysis determined that the envelope contained marijuana. The appellant was apprehended and placed in pretrial confinement on 20 November 1996. He was arraigned on 28 February 1997 and sentence was adjudged on 25 March 1997.

On 17 October 1997, after the convening authority had acted on his case, the appellant filed a petition for a new trial with the Judge Advocate General. Attached to his petition was a purported statement from Pvt Escobar to the effect that his testimony against the appellant was untrustworthy. The petition also complained that Mrs. White was coached during her testimony. The petition was forwarded to this court for resolution. RULE FOR COURTS-MARTIAL 1210(e), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.). Each of these arguments served as the basis for an assignment of error.

## Pretrial Confinement

In a summary assignment of error, the appellant claims that the military judge erred in denying his motion for appropriate relief related to his pretrial confinement. *See* R.C.M. 305(j)(1)(A) and (h)(2)(B). In his motion, the appellant had argued that the Initial Review Officer (IRO) abused his discretion in finding by a preponderance of the evidence that continued pretrial confinement was necessary in the appellant's case. R.C.M. 305(i)(2)(A)(iii).

Before ruling on the motion, the military judge considered the written briefs of the parties, the 48–hour letter submitted by the appellant's command, and the findings of the IRO. Appellate Exhibits I, II, III, and VI. He also heard testimony from the IRO and NCIS Special Agent Carruth, who was present and provided information to the IRO during the appellant's hearing. Record at 11–31. After considering the information available to the IRO, the military judge issued detailed findings of fact and then concluded that the IRO had not abused his discretion in ordering continued pretrial confinement. Record at 126, 131–32.

We review an IRO's ruling on the lawfulness of pretrial confinement for an abuse of discretion. *United States v. Gaither*, 45 M.J. 349, 351 (1996). We start by adopting the military judge's findings of fact, since they are supported by the record and are not clearly erroneous. Based on these findings of fact, we agree with the military judge that the IRO did not abuse his discretion when he concluded that continued confinement was necessary because the appellant represented a flight risk, was likely to engage in serious criminal misconduct if released, and that lesser forms of restraint were not adequate.[3] Accordingly, we find that the military judge did not err when he found no abuse of discretion by the IRO and denied the appellant's motion for appropriate relief. The assignment of error is without merit.

## Speedy Trial

In another assignment of error related to the motions practice in this case, the appellant asserts that the military judge erred in denying his motion to dismiss due to lengthy pre-accusation delays which resulted in a violation of his Fifth Amendment right to a speedy trial.[4]

---

3. Having concluded that there was no abuse of discretion on the part of the IRO, and although the appellant did not request review of his pretrial confinement based upon new information not available to the IRO or the Government's noncompliance with R.C.M. 305(i)(1) or (2), the military judge nonetheless determined that continued pretrial confinement was necessary in this case. We find that he did not abuse his discretion in making this ruling.

4. At trial, the appellant also argued that he was denied a speedy trial based upon a violation of

Prior to ruling on the motion, the military judge considered the briefs of counsel, documentary evidence related to the processing of the case against the appellant, and heard the testimony of NCIS Special Agents Carruth, Bray and Pipenhagen, as well as that of the trial counsel. Appellate Exhibits X–XIII; Record at 32–38, 44–71. In ruling on the motion, the military judge issued detailed findings of fact[5] and then concluded that the appellant had not been denied a speedy trial. Record at 133–37.

> [W]hether appellant's Fifth Amendment due process rights were violated will be tested under *United States v. Reed,* 41 M.J. 449, 451–53 (1995); *see also United States v. Mulderig,* 120 F.3d 534, 540 (5th Cir.1997). To succeed on his theory, appellant has the burden of showing 'an egregious or intentional tactical delay and actual prejudice.' *Reed,* 41 M.J. at 452.

*United States v. Thomas,* 49 M.J. 200, 208 (1998).

We once again adopt the military judge's findings of fact, since they are supported by the record and are not clearly erroneous. Based on these findings of fact, we find that the appellant has not carried his burden of showing "an egregious or intentional tactical delay and actual prejudice." *Reed,* 41 M.J. at 452. Accordingly, we agree with the military judge that the appellant was not denied his Fifth Amendment right to a speedy trial. The assignment of error is without merit.

### Severance

In the third of his assignments of error related to the motions practice in this case, the appellant asserts that the military judge erred in denying his motion to sever the charges. He contends that the offenses involved two distinct periods of time [May 1995 and October/November 1996], were totally unrelated, and served only to increase the maximum possible punishment and to make the appellant appear to be a gang member or habitual criminal. We disagree.

Traditionally, in military practice, all known charges against a servicemember are tried together at a single court-martial. *See* R.C.M. 307(c)(4); R.C.M. 601(e)(2); R.C.M. 601(e)(2), Discussion; R.C.M. 906(b)(10), Discussion; *United States v. Silvis,* 31 M.J. 707, 709 (N.M.C.M.R.1990). To justify separate trials, the charged servicemember must meet the very heavy burden of establishing that severance is necessary to prevent a manifest injustice. R.C.M. 906(b)(10); *Silvis,* 31 M.J. at 709. When a motion to sever charges is denied, our standard for review of that denial is whether the military judge abused his discretion. *United States v. Southworth,* 50 M.J. 74, 76 (1999); *United States v. Foster,* 40 M.J. 140, 148 (C.M.A.1994); *United States v. Curry,* 31 M.J. 359, 374 (C.M.A.1990).

Based upon our review of the record, we find that the appellant failed to establish that severance was necessary in order to prevent a manifest injustice. First, the appellant was tried before a military judge alone, who is presumed to have known and followed the law. *United States v. Prevatte,* 40 M.J. 396, 398 (1994). Second, we find no evidence that the appellant was tried for an offense on which the evidence was strong and which resulted in his conviction of an offense on which the evidence was relatively weak. *Silvis,* 31 M.J. at 709. Third, the findings announced by the military judge clearly reflect his careful consideration of the evidence relative to each offense, resulting in the appellant's acquittal of numerous charged offenses, and hence we see no evidence of any impermissible crossover. Finally, we find that trying the offenses together did not prevent the appellant from mounting a separate and distinct defense to each charge. *Foster,* 40 M.J. at 148. Accordingly, we find that the military judge did not abuse his discretion in denying the motion to sever. This assignment of error is without merit.

### Suppression of the Statement Obtained from an Illegal Wiretap

The appellant also moved at trial to suppress the tape recording of his 19 November

---

Article 10, UCMJ. He has not renewed that argument on appeal.

5. The military judge adopted the chronologies of events set out by counsel in their pleadings as part of his findings of fact. Appellate Exhibits X and XII; Record at 133.

1996 conversation with Pvt Escobar, arguing that it was obtained by means of an illegal wiretap. He asserted that the wiretap was illegal because the authorization, obtained in accordance with applicable directives, permitted the interception to take place aboard Marine Corps Base, Okinawa, and the actual seizure took place at the appellant's off-base apartment. The appellant claimed there was a violation of both the authorization and the Fourth Amendment. On appeal, he contends that the military judge erred when he denied this motion.

Prior to ruling on the motion, the military judge considered the briefs of counsel, documentary evidence related to the authorization to obtain wire and oral interceptions, and the testimony of NCIS Special Agent Carruth. Appellate Exhibits V–IX; Record at 32–38. In ruling on the motion, the military judge issued detailed findings of fact and then concluded that the appellant did not have a legitimate privacy interest in the disclosures he made to Pvt Escobar; that the request for authority to conduct oral and wire interceptions was legally sufficient; that the authorization was properly given; and, that the taking of the interceptions off-base did not serve to invalidate the authorization. Record at 126–30.

■ We review the military judge's decision on a suppression motion for an abuse of discretion, applying a clearly erroneous standard to his findings of fact and a *de novo* standard to his conclusions of law. *United States v. Moses*, 45 M.J. 132, 135 (1996); *United States v. Ayala*, 43 M.J. 296, 298 (1995).

■ Once again, we adopt the military judge's findings of fact, since they are supported by the record and are not clearly erroneous. Based on these facts, we find that the appellant did not have a legitimate expectation of privacy under the Fourth Amendment in the statements he voluntarily made to a third party, even though that third party was a cooperating witness wearing electronic monitoring devices. *See United States v. Caceres*, 440 U.S. 741, 750–52, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979); *United States v. White*, 401 U.S. 745, 751, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *United States v.*

*Samora*, 6 M.J. 360, 362 (C.M.A.1979). Additionally, since this was a consensual interception not conducted in violation of the Fourth Amendment or any statute applicable to members of the armed forces, Military Rule of Evidence 317, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.), does not apply. Finally, we agree with the military judge that NCIS was in substantial compliance with the Department of Defense Directive governing the interception of wire and oral communications and, even if NCIS had not been in substantial compliance, since the applicable directive explicitly states that it provides "guidance for the operation of the Department of Defense, but is not intended to, does not, and may not be relied on to create any right or benefit, substantive or procedural, enforceable by law against the United States," we find that such a violation, had it occurred, would not violate any of the appellant's constitutional rights and provides no basis for excluding the tape recording. Department of Defense Directive 5505.9 of 20 April 1995 at ¶ A2; *Caceres*, 440 U.S. at 754–55, 99 S.Ct. 1465. Finding no abuse of discretion on the part of the military judge, the assignment of error is without merit.

### Video Teleconference [VTC] Testimony

The Government's key witness in the charges related to the assault upon and maiming of Howard was Mrs. White. At the time of the trial, she was located in the United States. Since the Government did not have the power to subpoena her to return to Okinawa to testify, numerous steps were taken to induce her to voluntarily return, including making travelling and billeting arrangements in accordance with her express wishes. After reluctantly agreeing to appear to testify, on 20 March 1997, after the departure of Mrs. White's scheduled flight to Okinawa, her husband, Gunnery Sergeant [GySgt] White, sent the Government an electronic mail message stating that his wife would not come to Okinawa, but would agree to a deposition. In subsequent phone conversations, GySgt White indicated that his wife would not appear because she had spoken with her parents and they were concerned about her safety if she testified in

Okinawa. The record clearly reflects the sincerity of the Government's efforts to have Mrs. White appear in Okinawa to testify at the appellant's trial.

By the time Mrs. White declared her intention not to return to Okinawa, the Government had already secured the presence of three other witnesses from the United States and that of two Japanese civilians. Faced with the loss of a key witness, the Government requested permission to take Mrs. White's testimony by means of VTC. The appellant objected, claiming that such a procedure would violate his Sixth Amendment right to confront the witness and would deny him a fair trial. Prior to allowing the VTC testimony, the military judge heard the testimony of GySgt Thomas and Staff Sergeant [SSgt] Hamilton, two VTC technicians who explained how the VTC technology worked, its level of reliability, its capability to zoom in on documents and photographs, and how it would allow viewers to observe facial expressions. It was also established that the witness's reaction could be seen at the same time she was being shown documents. After the military judge rejected moving the situs of the trial to California or another location at which the Government would have the power to subpoena Mrs. White as "drastic remedies," he stated that the underlying reasons for the confrontation right could be accomplished by VTC, that VTC was preferable to the use of former testimony in the case of unavailable witnesses,[6] and that VTC was "far better than a deposition."[7] Record at 259–60. Finding that taking Mrs. White's testimony by VTC was necessary, the military judge granted the Government's request.

The VTC session was scheduled for the morning of Saturday, 22 March 1997.[8] Due to technical difficulties, the link was not established and the testimony was rescheduled for the following morning. The appellant then presented his case-in-chief prior to the Government resting its case. Mrs. White commenced her VTC testimony the next day at 0750, following the administration of the oath. Apparently three cameras were utilized. One was focused on Mrs. White, the second provided her with a "full table shot" of the court,[9] and the third was a document camera. The record is silent as to what, if any, other precautions were taken by the military judge with respect to controlling the VTC site in San Diego from which Mrs. White testified. At 0830, during redirect examination, the VTC link was lost for the remainder of the day. The court was called back to order at 0700, 24 March 1997, at which point redirect continued until 0730, when the link was again lost. The link was reestablished at 0830 that same day and Mrs. White's testimony continued until its conclusion at 0855, 24 March 1997, at which point the court was recessed.

When the court was next called to order at 1005, 24 March 1997, the military judge related an event which had occurred in the interim as follows:

> At the conclusion of the session we just had in the conference room concerning the video teleconference and the testimony of Ms. White, after we had terminated the transmission and concluded the taking of her testimony, as we were preparing to leave, Lieutenant Bauer brought matter to my attention. Lieutenant Bauer indicated that during his cross-examination that he

6. Mrs. White did not testify at the Article 32, UCMJ, hearing and there was no former testimony which might have been admissible under Mil. R.Evid. 804(b)(1). The military judge was indicating that, in his view, the use of VTC was more advantageous to an accused than, for example, that exception to the hearsay rule.

7. The military judge did not explain why he reached this conclusion.

8. Unless otherwise indicated, dates and times reflect those at the situs of the trial in Okinawa. Because of the international date line and differ-

ences in time zones, Saturday morning in Okinawa was Friday afternoon in San Diego, Mrs. White's location.

9. The military judge gave the trial defense counsel various options concerning what Mrs. White would see during her testimony. The options included "a full table shot, a shot of just him and his client, a shot of just his client, and he opted for a full table shot." Record at 311. The record does not otherwise describe what Mrs. White could see.

could hear a voice coaching the witness several times as she testified.

Record at 340.

After mildly counseling defense counsel on the timeliness of bringing such matters to his attention, the military judge stated:

I will note for the record that I did hear three things; and that is, twice I could clearly hear a voice that would repeat a question; once I will note that there is some delay in the audio transmission; once I could clearly hear my voice as the witness began to talk.

Record at 341. Other than stating that he did not find any inconsistencies in Mrs. White's testimony between the first and second day of her testimony, the military judge simply continued with the remainder of the trial.

After the court was adjourned, but prior to authentication of the record, the military judge ordered a post-trial Article 39(a), UCMJ, session in response to a motion for appropriate relief filed by the appellant. The appellant was seeking to have Mrs. White's testimony stricken as tainted, based upon the involvement of the third party during the VTC session. He also sought to have the finding of guilty as to the maiming charge reconsidered and to have the sentence reassessed. In support of his motion, the appellant offered the audio tape of the VTC testimony, a stipulation of fact concerning what could be gleaned from the audio tape,[10] and a statement from the VTC technician present during Mrs. White's testimony.[11] Revision Appellate Exhibits III–V. The Government did not offer any evidence on the motion. After hearing argument, the military judge expressed disappointment with both counsel for failing to gather more evidence relevant to the motion. Nonetheless, he elected to rule on the motion without ordering the production of anything more than what he was given by counsel and what was contained in the record of trial.

After approximately three hours of deliberation, the military judge issued essential findings of fact and, based upon those findings, ruled that the communication between the third party and Mrs. White during her testimony was error, but that they did not discuss substantive matters and the error was harmless beyond a reasonable doubt. Record at 399–400.

On appeal, the appellant asserts that the military judge erred both by allowing Mrs. White to testify by VTC and also by failing to strike her testimony once it was shown to have been tainted. He claims that his Sixth Amendment confrontation right was abridged and, without conceding that VTC testimony by an adult is ever appropriate absent the consent of the accused, he contends that the necessity test established in *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990), is the proper standard in this case.

In the recent case of *United States v. Anderson*, 51 M.J. 145, 149–50 (1999), the U.S. Court of Appeals for the Armed Forces summarized the state of the law on this issue as follows:

The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." This is a funda-

---

10. The following colloquy was admitted in the stipulation between the Government and appellant:

| Defense Counsel: | Didn't you say yesterday he was not wearing a hat? |
| Mala White: | Yesterday I didn't recall because it's been so long but |
| Unidentified Voice: | But after looking over ... |
| Mala White: | But after looking over I started really thinking, going back, correctly, he was wearing a hat, he ... had it turned around backwards. |

| Defense Counsel: | When you talked to me on the phone last week, ... you said he was not wearing a hat? |
| Unidentified Voice: | Because you couldn't recall ... |
| Mala White: | Because I couldn't recall, it's been like two ... years. |

Revision Appellate Exhibit V.

11. The technician wrote in his statement that he was present during her testimony on "Sunday, March 23, 1997." Revision Appellate Exhibit IV. We note that 23 March 1997 was a Saturday.

mental right. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). "There are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Id.* at 405, 85 S.Ct. 1065.

The Confrontation Clause "reflects a preference for face-to-face confrontation at trial." *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); see also *Maryland v. Craig,* 497 U.S. 836, 849, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)("a preference that 'must occasionally give way to considerations of public policy and the necessities of the case' ")(quoting *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 39 L.Ed. 409 (1895)). Normally, the Confrontation Clause requires the defendant's presence and ability to see the accusatory witnesses. Exceptions may be made. A second aspect of the Confrontation Clause is that the witnesses are under oath. A third is that the defendant has the right to have the finders of fact evaluate the demeanor of the witnesses. Fourth, the Confrontation Clause includes the right to cross-examine these witnesses. *See California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). While this right is fundamental, it is not absolute. *Chambers v. Mississippi,* 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) ("Of course, the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process."). There are various interests that must be balanced against the defendant's right of confrontation, including the Government's "strong interest in effective law enforcement," *Roberts, supra* at 64, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597, the state's compelling "interest in the physical and psychological well-being of a minor victim," *Craig, supra* at 852, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666, and the "societal interest in accurate factfinding." *Bourjaily v. United States,* 483 U.S. 171, 182, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

The right of confrontation may yield to an important public policy when the reliability of the testimony at issue is otherwise assured. *Maryland v. Craig, supra.* In *Craig,* closed-circuit television was approved in a case involving a child victim where: "(1) there was a case-specific finding that testimony by the child in the presence of the defendant would cause the child to suffer serious emotional distress such that the child could not reasonably communicate; (2) the impact on the child would be 'more than *de minimis* '; (3) the child testified via one-way closed-circuit television, enabling the judge, jury, and defendant to observe the child's demeanor during testimony; and (4) the child was subject to full cross-examination." *United States v. Longstreath,* 45 M.J. 366, 372 (1996), citing *Craig, supra* at 856–57, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666. As illustrated in *Longstreath,* any deviations from the common form of confrontation must ensure the reliability of the evidence.

This Court has upheld various methods of obtaining testimony without face-to-face confrontation between an accused and a child victim. *See United States v. Williams,* 37 M.J. 289 (CMA 1993)(child testified from a chair in the center of the courtroom*); United States v. Thompson,* 31 M.J. 168 (CMA 1990)(children testified with their backs to the accused, but facing the judge and counsel); *but see United States v. Daulton,* 45 M.J. 212 (1996)(accused excluded but permitted to observe the child through closed-circuit television). To support a determination to limit the right to face-to-face confrontation, the military judge must make a finding of necessity, *i.e.,* that there is a likelihood that the child will suffer at least moderate emotional and mental harm if required to testify in the accused's presence. *See D.A.D. v. State,* 566 So.2d 257 (Fla.App.1990). This finding is a question of fact which "will not be reversed unless it is clearly erroneous or unsupported by the record." *Longstreath, supra* at 373, citing *United States*

v. *Carrier*, 9 F.3d 867, 870–71 (10th Cir. 1993).

*Anderson*, 51 M.J. at 149–50.

■ We believe that the age of the victim alone is not determinative of whether VTC testimony satisfies the Confrontation Clause in a given case. Rather, it is but one of the criteria that a military judge may consider when determining whether denial of face-to-face confrontation at trial is necessary to further an important public policy. See *United States v. Gigante*, 166 F.3d 75 (2d Cir.1999); *State v. Sewell*, 595 N.W.2d 207 (Minn.Ct.App.1999); *Harrell v. State*, 709 So.2d 1364 (Fla.1998), *cert. denied*, 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998).

■ Assuming that the use of VTC was necessary in this case, we nonetheless find that the appellant's Sixth Amendment right to confront Mrs. White was violated when the military judge failed to ensure the reliability of her testimony at any of three crucial points in the trial. First, as he recognized after the fact,[12] the military judge should have established and enforced a clear protocol which established control over the VTC site used by Mrs. White.[13] Second, once he heard a voice at the remote site repeating questions for the witness, the mili-tary judge should have immediately inquired into the circumstances surrounding Mrs. White's testimony.[14] Finally, the military judge was properly disappointed in the post-trial efforts of counsel to discover the full extent of the impact the third party had upon Mrs. White's testimony, but abused his discretion when he accepted their offerings and the record of trial as adequate evidence upon which to conclude that the witness and third party did not discuss substantive matters and that the error was harmless beyond a reasonable doubt. As the Government candidly admitted during oral argument, we simply cannot tell from the record before us the full extent of the coaching Mrs. White received during her testimony.[15] Not knowing the extent of the taint upon her testimony, and Mrs. White being the key witness to the maiming charge, we cannot find harmless error in this case. Finding material prejudice to a substantial right of the appellant, we will provide relief in our decretal paragraph.[16]

### Petition for a New Trial

The appellant petitioned for a new trial based upon the coaching of Mrs. White during her VTC testimony and based upon Gov-

---

12. "I believe that this case points out the difficulty associated video teleconference site. And when I say that I'm making reference to my responsibility to control the environment or the atmosphere at both ends. With hindsight, I now believe that the better practice to follow is to have all the parties that were present within the room at both locations identify themselves on camera and state their purpose for being there. Because of the difficulty in trying to control a proceeding at a distant location, it might be advisable to have another with and the need to control the proceedings at both ends of the VTC or Judge Advocate present at the distant site to observe the proceedings at the location to ensure that nothing improper occurs and that can testify, if need be, should there be any questions or challenge to the proceedings at a later time."

Record at 400.

13. At present there is no Rule for Courts–Martial that establishes the procedures to be followed when taking VTC or other remote site testimony. We encourage the adoption of such a Rule and, in the interim, recommend that trial judges consider the procedures developed in *In re San Juan Dupont Plaza Hotel Fire Litigation*, 129 F.R.D. 424 (D.P.R.1989), which provide an excellent example of the type of thought and preparation that should attend the use of live satellite testimony in order to preserve the constitutional rights of an accused. A portion of the district court's order containing the detailed protocol and procedure used in that case is attached to this opinion as Appendix A.

14. The military judge also recognized this missed opportunity after the fact, stating that: "When I first heard the witness repeat—or I heard a voice, I should say, repeat a question asked, I should have questioned who that voice belonged to at that time." Record at 400–01.

15. At the post-trial Article 39(a), UCMJ, session the parties agreed that "[a]lthough the voice could be heard on several occassions [sic], it was difficult to understand the words it was speaking, due to the various echoes and the perceptible delay in the transmission of the VTC." Revision Appellate Exhibit V.

16. Based upon the evidence presented at the original trial, we reject the appellant's assignment of error challenging the factual sufficiency of that evidence with respect to the maiming charge.

ernment misconduct. In view of our action with respect to the maiming charge, we consider the appellant's Petition for a New Trial pertaining to that charge to be moot.

In support of his petition as to the allegation of Government misconduct, the appellant attached a hand-printed, unsworn, unsigned letter purportedly from Pvt Escobar to the "Honorable Sherrod Brown." The letter discusses Pvt Escobar's involvement with both NCIS and the appellant. Based upon this letter and two letters attached to trial defense counsel's clemency petition, both indicating that Pvt Escobar had been counseled to lie to to a defense counsel in an unrelated case during an interview in order to conceal his then ongoing assistance to NCIS, the appellant demands a new trial, or a *DuBay* [17] hearing. We disagree.

Petitions for new trial based on a witness's recantation "are not viewed favorably in the law." *United States v. Giambra*, 33 M.J. 331, 335 (C.M.A.1991). They should not be granted unless "the court is reasonably well satisfied that the testimony given by a material witness is false." *Id.*, *quoting Larrison v. United States*, 24 F.2d 82, 87 (7th Cir.1928); *United States v. Rios*, 48 M.J. 261, 268 (1998).

Additionally, R.C.M. 1210(f), provides two grounds for the granting of a new trial. If the basis is "newly discovered evidence," a new trial is appropriate only when that evidence, "if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused." R.C.M. 1210(f)(2)(C). If the basis is "fraud on the court-martial," a new trial is not warranted unless the fraud "had a substantial contributing effect on a finding of guilty or the sentence adjudged." R.C.M. 1210(f)(3).

In this case, it is quite clear from the findings that the military judge placed little credence in what Pvt Escobar had to say, except where it was corroborated by independent evidence. The tape recorded conversation between Pvt Escobar and the testimony of NCIS Special Agents Pipenhagen and Carruth provided overwhelming evidence

of the appellant's guilt of distributing marijuana to Pvt Escobar on 19 November 1996. Nothing in the purported letter from Pvt Escobar, or the letters contained in the appellant's clemency petition, indicate that fraud had a substantial contributing effect on the finding of guilty, or that introduction of the matters contained in these letters would probably produce a substantially more favorable result for the accused. As a result, the petition for a new trial is denied, and we find the related assignment of error to be without merit.

## Conclusion

Accordingly, we affirm only the finding of guilty of distribution of marijuana. We set aside the finding of guilty of maiming and the sentence. The record of trial is returned to the Judge Advocate General for remand to the same or a different convening authority, who may order a rehearing on the charge of maiming and on the sentence. If a rehearing on the maiming charge is deemed impracticable, the convening authority may dismiss that charge and order a rehearing on sentence for the distribution of marijuana charge alone. If a rehearing on sentence is deemed impracticable, a supplementary court-martial order should be issued reflecting that determination and the convening authority may approve a sentence of no punishment, in accordance with R.C.M. 1107(e)(1)(C)(iii) and *United States v. Montesinos*, 28 M.J. 38 (C.M.A.1989).

Chief Judge DeCICCO and Judge ANDERSON concur.

### Appendix A

Master File MDL No. 721— ORDER NO. 230

In re SAN JUAN DUPONT PLAZA HOTEL FIRE LITIGATION 129 F.R.D. 424 (D.P.RICO. 1990)

January 2, 1990, Decided PROCEDURE FOR SATELLITE TRANSMISSION

I. COURTROOM IN PUERTO RICO

  A. Court and parties—places as usual

  B. Witness—

  1. Replaced by 30–inch screen on witness stand ("witness screen").

17. *United States v. DuBay*, 17 U.S.C.M.A. 147, 37     C.M.R. 411 (C.M.A.1967).

2. Witness screen facing podium and jury box.

3. Full torso frontal image on witness screen at all times.

4. Witness will be seen on all monitor screens (including jury box and public area) during his testimony to ensure all present have proper view.

5. Admitted exhibits and evidence shown via satellite to the witness (pending ruling on admissibility) will be shown on all courtroom screens with the exception of the image on the witness stand, i.e., the witness will be displayed on the witness screen at all times.

C. Questioning attorney—

1. Will address screen as if witness were on stand.

2. Amended Pretrial Order No. 181 . . . . and other pertinent Orders apply, i.e., face witness, stand behind podium, . . . etc.

D. Side bars and objections—

1. When side bar is allowed by the Court, the jury's sound will be automatically cut off but not the sound to the place of origin of the transmission so that the studio courtroom clerk can follow the arguments and the Court's subsequent ruling.

2. The witness hears all objections unless instructed by the Court, pursuant to a party's request, to use the headphones. (He remains on witness screen and studio courtroom clerk will advise him when to take them off.)

## II. LOCATION WHERE TRANSMISSION IS ORIGINATING FROM

A. The witness will sit facing the camera.

B. A monitor will be placed in front of the witness where he will see the courtroom proceedings as if he were sitting in the witness stand.

C. During questioning the witness will have a full view of the attorney at the podium.

D. During objections the witness will see a view of the courtroom well focusing on each attorney addressing the Court or the judge when speaking.

E. Due to technical reasons the monitor should not be "blacked out" (ATT may believe that signal is off and that there is a problem with the transmission). Therefore, should there be a need for the witness not to look into his monitor, the Judge will instruct the witness not to look/face the monitor and the courtroom clerk at the studio shall so be advised to ensure the witness complies.

F. The witness will see the judge in the monitor whenever the presiding judge addresses him, i.e., instruct or question. (Judge must address camera located over his monitor.)

G. Documents available at the studio (listed by PSC in agenda) will be handed to witness by courtroom clerk in studio. Other documents or evidence will be shown to the witness on the screen or sent by telecopier.

## III. MISCELLANEOUS

A. Identify for record who is present with the witness before he starts to testify. (Scan area with camera)

B. Location of studio courtroom clerk vis-a-vis camera and monitor at studio.

C. Advise the parties, the jury and the witness that there is a slight delay of seconds between questions and answers. Witness must wait for the objections.

D. Breaks—will only be allowed for emergencies. In the event of an emergency break the witness will remain in the room in the presence of the studio deputy clerk at all times without communication to or from any person or other source. If it is an extended break the witness will be permitted to go the rest room and be provided with lunch.

E. Instruct witness not to talk to counsel during breaks.

F. Duties of studio courtroom clerk.

G. Video recording at studio not allowed; only in Puerto Rico.

H. Court reporter in Puerto Rico—official record.