UNITED STATES, Appellee

v.

Terry MCCOLLUM, Staff Sergeant
U.S. Air Force, Appellant

No. 02-0474

Crim. App. No. 34324

_____

United States Court of Appeals for the Armed Forces

Argued November 6, 2002 and February 5, 2003

Decided June 24, 2003

BAKER, J., delivered the opinion of the Court, in which GIERKE,
EFFRON, and ERDMANN, JJ., joined. CRAWFORD, C.J., filed a
separate concurring opinion.


Counsel

For Appellant:  Major Jefferson B. Brown (argued); Colonel
   Beverly B. Knott, Major Maria A. Fried, Major Terry L.
   McElyea, and Major Jeffrey A. Vires (on brief).

For Appellee:  Major Linette I. Romer (argued); Lieutenant
   Colonel LeEllen Coacher, and Lieutenant Colonel Lance B.
   Sigmon (on brief).



Military Judge:  Linda S. Murnane

THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION

Judge BAKER delivered the opinion of the Court.

Appellant was tried by a general court-martial composed of a military judge alone. Contrary to his pleas, Appellant was convicted of rape, indecent acts with a child under the age of 16, and carnal knowledge, on divers occasions in violation of Articles 120 and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 920, 934 (2000), respectively. Appellant was sentenced to a dishonorable discharge, eighteen years' confinement, and reduction to E-1. The convening authority approved the sentence as adjudged. The Air Force Court of Criminal Appeals affirmed the findings and sentence. United States v. McCollum, 56 M.J. 837 (A.F. Ct. Crim. App. 2002). We granted review on the following issues:

I

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL
ERROR BY REQUIRING THE ABSENCE OF APPELLANT
DURING THE TESTIMONY OF AN ALLEGED VICTIM (CS),
IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHT
TO CONFRONT HIS ACCUSER, WHEN THERE WAS NO BASIS
TO SUPPORT SUCH A RULING.

II

WHETHER THE MILITARY JUDGE COMMITTED PREJUDICIAL
ERROR BY DENYING THE DEFENSE'S MOTION TO SUPPRESS
AND HOLDING THAT CERTAIN STATEMENTS MADE BY
APPELLANT TO HIS WIFE DID NOT FALL WITHIN THE
PRIVILEGE FOR CONFIDENTIAL MARITAL
COMMUNICATIONS.

Subsequent to holding oral argument on these issues on November 6, 2002, we specified the following additional issue:

> IS THERE A "DE FACTO CHILD" EXCEPTION TO THE HUSBAND-WIFE PRIVILEGE UNDER THE MILITARY RULES OF EVIDENCE, AND, IF SO, IS IT APPLICABLE TO THE PRESENT CASE?

On Issue I, we affirm the Court of Criminal Appeals. The military judge did not violate Appellant's Sixth Amendment right to confront a witness against him by allowing CS to testify outside of Appellant's presence. The military judge correctly applied Military Rule of Evidence [hereinafter M.R.E.] 611(d) consistent with Maryland v. Craig, 497 U.S. 836 (1990). In addition, the military judge properly protected the other aspects of Appellant's confrontation rights.

On Issue II, we conclude that Appellant's statements were privileged under M.R.E. 504(b)(1). We also hold that there is no de facto child exception to M.R.E. 504(c)(2)(A). As such, because MW was not a biological child or a legally recognized child or ward of Appellant or his wife, RM, Appellant's statements were not admissible under that exception and should have been excluded. The military judge therefore abused her discretion by admitting those statements. Nevertheless, for the reasons discussed

3

below, we affirm Appellant's conviction because any errors committed by the military judge were harmless.

## Issue I: Right to Confront Witnesses

A.   Factual Background

In 1999, Appellant met SK over the Internet. Eventually, the two began a romantic relationship and, at Appellant's request, SK and her four children moved from Connecticut to Seymour Johnson Air Force Base, North Carolina, to live with him in his base housing.  Because of the number of people in the house, SK's 11-year old daughter, CS, slept on the couch in the living room.  One night, SK awoke, entered the living room, and found Appellant naked, sexually aroused, and poised over CS.  SK testified that "as I approached him even more, I saw him naked and her panties were down and he was kissing on her and I just exploded in an outrage."  Some days later, during an argument, Appellant admitted to SK to having sexually assaulted CS on another occasion.  SK then called the police and reported that Appellant had raped CS.

Appellant was thereafter charged with rape and indecent acts with a child, in violation of Articles 120 and 134.  At one point during Appellant's trial, trial counsel moved to allow CS, then 12 years old, to testify from a remote location via two-way closed circuit

4

television, as authorized by M.R.E. 611(d). Defense counsel contested the motion, arguing that trial counsel had not met the requirements of M.R.E. 611(d)(3) and Craig. Defense counsel also argued that there was insufficient evidence to establish that CS would suffer such trauma that she would be unable to testify in Appellant's presence. Allowing CS to testify outside of Appellant's presence, asserted defense counsel, would therefore violate Appellant's Sixth Amendment right to confront a witness against him. In the alternative, Appellant volunteered to withdraw from the courtroom during CS's testimony, as permitted by M.R.E. 611(d)(4), if the military judge found that the requirements of M.R.E. 611(d)(3) and Craig had been met.

During a hearing on the motion, trial counsel called Ms. Joan Prior, a licensed clinical social worker, as an expert to testify about the potential harm to CS from having to testify in Appellant's presence. Ms. Prior had counseled CS 11 or 12 times in weekly sessions. The military judge accepted Ms. Prior as an expert in the field of diagnosing and treating children who have been sexually abused, and allowed her to testify about CS's expected response to testifying in front of Appellant.

In her testimony, Ms. Prior opined that CS would suffer emotional harm if required to testify in Appellant's presence. Testifying in front of Appellant, she stated, would cause CS to "decompensate" or "function in a more disorganized way . . . . She would become highly agitated, her anxiety would increase so that her level of functioning would change overall. She might have a reoccurrence of nightmares, she might become more withdrawn." She added that it could setback her healing process and reactivate some of the symptoms of CS's Post Traumatic Stress Disorder (PTSD). While noting that testifying in court, by itself, would be harmful to CS, Ms. Prior added that the harm would be "extremely" aggravated if Appellant were present. When asked about CS's desire to testify in Appellant's presence, Ms. Prior explained that although CS wanted to testify in front of Appellant, doing so would be, in her opinion, "detrimental to her." Finally, in response to the military judge's questions about whether CS had expressed any fear of Appellant, Ms. Prior testified, without objection, that CS had told her that she was afraid Appellant would beat her if she ever told anyone about the abuse.

Based on Ms. Prior's testimony, the military judge found that CS "would be traumatized if required to testify in open court in the presence of the accused." CS, the

military judge said, "is unable to testify in open court because of the presence of the accused because of her fear the accused would beat her." This fear, stated the military judge, causes CS "emotional trauma." Therefore, she held that trial counsel had met the requirements of M.R.E. 611(d)(3)(A) and Craig. The military judge then granted the Government's motion to have CS testify from a remote location by two-way closed circuit television. The military judge, however, explained that if Appellant chose to absent himself from the courtroom, CS would have to testify in the courtroom as required by M.R.E. 611(d)(4).

When trial counsel called CS to testify, Appellant informed the military judge that he wanted to withdraw from the courtroom. After determining that Appellant's choice was voluntarily made and that he understood his right to be present in the courtroom during the entire trial, the military judge granted his request to withdraw and ordered that CS testify in the courtroom. The military judge, however, ensured that Appellant would be able to view the proceedings via closed circuit television and allowed him to communicate with his counsel by telephone at all times during CS's testimony.

The military judge ultimately convicted Appellant of raping CS and engaging in indecent acts with her.

Appellant appealed his conviction to the Air Force Court of Criminal Appeals, arguing that the military judge violated his Sixth Amendment right to confront a witness against him by not allowing him to be present during CS's testimony. McCollum, 56 M.J. at 838.  The Court of Criminal Appeals affirmed the military judge's decision, concluding that there was "ample evidence" to establish that the military judge, "applying the criteria of both M.R.E. 611(d)(3) and Craig, properly found that the child was unable to testify because of her fear of [A]ppellant."  Id. at 840.  This conclusion, together with the fact that CS "testified under oath, and was subjected to cross-examination by opposing counsel, in the presence of the court-martial, and in the view of [A]ppellant and his counsel," led the lower court to conclude that Appellant had not been denied his right to confront CS.  Id. at 841.

On appeal before this Court, Appellant maintains that the military judge applied M.R.E. 611(d) in such a way as to deprive him of his Sixth Amendment right to confront a witness against him.  He argues that CS's fear and her trauma resulted from testifying generally, and not, as the military judge found, from Appellant's presence.  Appellant also contends that the military judge should have questioned CS, or allowed defense counsel to question CS,

8

before making her M.R.E. 611(d) ruling.  In addition,

Appellant claims that "the 'fear' that the military judge

found existed--that Appellant would beat CS--was

unreasonable."  Finally, Appellant asserts that the

military judge erred when she found that CS would suffer

more than de minimis trauma from testifying in his

presence.

B.    Sixth Amendment Confrontation Case Law

The Confrontation Clause of the Sixth Amendment

guarantees that "[i]n all prosecutions, the accused shall

enjoy the right . . . to be confronted with the witnesses

against him."  The Supreme Court has explained that this

right contains several protections:

> [T]he right guaranteed by the Confrontation
> Clause includes not only a "personal
> examination," but also "(1) insures that the
> witness will give his statements under oath -
> thus impressing him with the seriousness of the
> matter and guarding against the lie by the
> possibility of a penalty for perjury; (2) forces
> the witness to submit to cross-examination, the
> 'greatest legal engine ever invented for
> discovery of the truth'; [and] (3) permits the
> jury that is to decide the defendant's fate to
> observe the demeanor of the witness in making his
> statement, thus aiding the jury in assessing his
> credibility.

Craig, 497 U.S. at 845-46 (quoting California v. Green, 399

U.S. 149, 158 (1970)).  Although each of these protections

serves to "ensure the reliability of the evidence against a

9

criminal defendant," the Court has stressed that an accused's right to physical, face-to-face confrontation with witnesses against him forms the core of the Confrontation Clause. See id. at 844-50; Coy v. Iowa, 487 U.S. 1012, 1016 (1988)(noting that although there is "some room for doubt" about whether the clause protects against the admission of out-of-court statements or restricts the scope of cross-examination, the Court has "never doubted . . . that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact.").

Despite the Confrontation Clause's emphasis on physical, face-to-face confrontation, it is not an absolute right. Craig, 497 U.S. at 844-50. The Supreme Court in Craig provided the following guidance for analyzing exceptions to physical confrontation:

> That the face-to-face confrontation requirement is not absolute does not, of course, mean that it may be easily dispensed with. As we suggested in Coy, our precedents confirm that a defendant's right to confront accusatory witnesses may be satisfied absent physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.

Id. at 850 (citations omitted). Therefore, Craig stands for the proposition that a witness may testify out of an

10

accused's presence only where the trial court finds (1) that there is an important public interest that will be served by denying physical confrontation, (2) that such denial is necessary to further that interest, and (3) that other measures will ensure the reliability of the testimony.

In Craig, the Court determined that society has an important public interest in "the physical and psychological well-being of a minor victim." Id. at 852. Hence, it held, "if the State makes an adequate showing of necessity, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant." Id. at 855.

The Court also explained the essential aspects of a finding of necessity in cases where the physical or psychological well being of a child witness is at stake. The showing of necessity, determined the Court, must not be a generalized one. The trial judge must make a case-specific finding that testimony outside the presence of the accused is "necessary to protect the welfare of the

11

particular child who seeks to testify." Id. Moreover, denial of face-to-face confrontation is only necessary to protect a child witness from trauma where "it is the presence of the defendant that causes the trauma." Id. at 856. Finally, before a court denies an accused the right to confront a witness face-to-face, "the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than de minimis, i.e., more than 'mere nervousness or excitement or some reluctance to testify.'" Id. (quoting Wildermuth v. State, 530 A.2d 275, 289 (Md. 1987)). While the Court declined to establish a minimum level of distress necessary for a child witness to testify outside of the accused's presence, it upheld a Maryland law allowing such a procedure where a judge finds that the child will suffer "'serious emotional distress such that the child cannot reasonably communicate[.]'" Id. at 856 (quoting Md. Code Ann. Cts. & Jud. Proc. § 9-102 (1989)).

In our most recent application of Craig, we echoed these requirements when we upheld a military judge's decision to let two child witnesses testify behind a screen because they were unable to testify in the accused's presence. See United States v. Anderson, 51 M.J. 145, 150 (C.A.A.F. 1999).

12

C.    M.R.E. 611(d)

In response to Craig and subsequent to this Court's decision in Anderson, M.R.E. 611 was amended in 1999 to include subsection (d).  Executive Order No. 13,140, 64 Fed. Reg. 55, 115 (Oct. 12, 1999).  As a result, this is our first occasion to consider the amended rule.  M.R.E. 611(d) is similar to 18 U.S.C. § 3509(b)(1) (2000), a federal provision enacted in the wake of Craig, which authorizes a child to testify via two-way closed circuit television when certain conditions are met.  See United States v. Daulton, 45 M.J. 212, 218 (C.A.A.F. 1996); United States v. Moses, 137 F.3d 894, 897-98 (6th Cir. 1998); United States v. Garcia, 7 F.3d 885, 887-88 (9th Cir. 1993).

M.R.E. 611(d)(3), like § 3905(b)(1)(B), authorizes remote live testimony

> where the military judge makes a finding on the
> record that a child is unable to testify in open
> court in the presence of the accused, for any of
> the following reasons:
>
> (A)  The child is unable to testify because of
>      fear;
> (B)  There is substantial likelihood, established
>      by expert testimony, that the child would
>      suffer emotional trauma from testifying;
> (C)  The child suffers from a mental or other
>      infirmity; or
> (D)  Conduct by an accused or defense counsel
>      causes the[ ]child to be unable to continue
>      testifying.

13

However, M.R.E. 611(d) does not allow the use of remote live testimony where the accused voluntarily withdraws from the courtroom during the child's testimony, as the military judge correctly concluded in this case. See M.R.E. 611(d)(4).

Appellant argues that M.R.E. 611(d)(3) "differs in key respects" from the statute upheld in Craig. He asserts that the rule can only pass "constitutional muster" if we read certain language into it, as the Supreme Court did to the Maryland statute in Craig, and as the 9th Circuit did to § 3509 in Garcia. Specifically, Appellant asserts that M.R.E. 611(d)(3) is constitutional as applied only if (1) the military judge finds that the child witness will suffer such trauma that he or she will be unable to testify; and (2) the potential trauma or fear causing trauma is the result of an accused's presence.

M.R.E. 611(d) was adopted to "give substantive guidance to military judges regarding the use of alternative examination methods for child victims and witnesses in light of the U.S. Supreme Court's decision in Maryland v. Craig, 497 U.S. 836 (1990) and the change in Federal law in 18 U.S.C. section 3509." Manual for Courts-Martial, United States (2002 ed.) [hereinafter MCM],

14

Analysis of the Military Rules of Evidence A22-48 [hereinafter Drafter's Analysis]. Prior to the addition of M.R.E. 611(d), it was unclear whether § 3509 applied to courts-martial. See Daulton, 45 M.J. at 218-19 ; United States v. Longstreath, 45 M.J. 366, 372 (C.A.A.F. 1996). It therefore follows that we should interpret M.R.E. 611(d) consistently with Craig.

M.R.E. 611(d)(3) authorizes the use of remote live testimony where "the military judge makes a finding on the record that a child is unable to testify in open court in the presence of the accused[.]" (Emphasis added.) Apparent in this language is Craig's requirement that the inability to reasonably testify result from the presence of the accused and not the overall court experience. Moreover, we interpret this language, in light of Craig, as limiting the use of remote live testimony to situations where the military judge makes a finding that the child witness would suffer more than de minimis emotional distress from testifying in the accused's presence, whether brought on by fear or some form of trauma.[1] In other words, under M.R.E. 611(d)(3), such distress must be sufficiently serious that it would prevent the child from reasonably testifying.

---

[1] We do not address Military Rule Evidence 611(d)(3)(C) or (D) [hereinafter M.R.E.] as they are inapplicable in the present case.

Whether such a standard is required as a matter of constitutional law is an issue the Court did not address in Craig. It is sufficient for our purposes in this case to note that the standard established in M.R.E. 611(d)(3) is similar to that upheld in Craig.

Our conclusion that M.R.E. 611(d)(3) must be interpreted in light of Craig is consistent with the manner in which federal circuits have interpreted the parallel language of § 3509 to include the necessity requirements of Craig. See Moses, 137 F.3d at 898; United States v. Rouse, 111 F.3d 561, 568-69 (8th Cir. 1997); Garcia, 7 F.3d at 888. In Garcia, for example, the Ninth Circuit Court of Appeals addressed the constitutionality of § 3509(b)(1)(B). Id. at 888. The defendant in Garcia argued that the provision must either implicitly incorporate the requirements imposed by Craig or be unconstitutional in application. Id. The Ninth Circuit agreed. Looking at the statute, it concluded that Congress intended the provision to codify the requirements of Craig. Id. It interpreted the phrase "the child is unable to testify in open court in the presence of the defendant" as requiring trial judges to find that the child is unable to testify "due to the presence of the defendant." Id. Moreover, the

court held that Congress intended the same phrase to require more than a finding of de minimis trauma.  Id. Finally, the court concluded that the degree of trauma necessary to find that a child was unable to testify, and thus invoke § 3509(b)(1), was akin to that upheld "in Craig which required that the child's emotional distress be such that he 'cannot reasonably communicate.'"  Id.

Before authorizing the use of remote live testimony in this case, the military judge looked to both M.R.E. 611(d) and Craig and stated on the record:

> Military Rule of Evidence 611(d) states, in pertinent part: "Remote live testimony will be used only where the military judge makes a finding on the record that a child is unable to testify in open court in the presence of the accused, for any of the following reasons: (A) the child is unable to testify because of fear."
>
> Maryland v. Craig, 497 U.S. 836 (1990), . . . in pertinent part held that prior to allowing out-of-court testimony[,] in order to meet the accused's constitutional right to confront witnesses against him, a trial court must find the witness would suffer emotional trauma if forced to testify in the conventional manner; the trauma would be caused by the presence of the accused and not by the formal courtroom setting; and the trauma must be more than de minimis . . . .
>
> Combining the requirements of Maryland v. Craig with M.R.E. 611(d), the questions which must be answered affirmatively before this [c]ourt can authorize the remote live testimony of [CS] are as follows: Does the case involve the abuse of a child?  Is the witness a child witness or a child victim?  Is the child unable to testify in open court because of the presence of

17

> the accused, and because of her fear of the
> accused which causes her emotional trauma as
> shown by expert testimony?

By combining the requirements of Craig and M.R.E. 611(d)(3), the military judge derived the appropriate legal standard for a proper finding of necessity. She determined that prior to authorizing remote live testimony, a military judge must find that the witness would be unable to testify because of the accused's presence. She also concluded that the fear or trauma caused by the presence of the accused must be more than de minimis. While the military judge appears to have concluded that both fear and trauma were required for a finding of necessity, the Supreme Court's language in Craig is sufficient to uphold the constitutionality of both M.R.E. 611(d)(3)(A) and (B), independent of each other. Federal circuit courts addressing the constitutionality of § 3509(b)(1)(B)(i) and (ii) have reached the same conclusion. See Moses, 137 F.3d at 898 (explaining that § 3509(b)(1)(B)(i) "requires a case-specific finding that a child witness would suffer substantial fear or trauma and be unable to testify or communicate reasonably because of the physical presence of the defendant.")(emphasis added); United States v. Farley, 992 F.2d 1122, 1125 (10th Cir. 1993)(affirming the use of remote live testimony under both § 3509(b)(1)(B)(i) and

(ii)). The military judge therefore applied the appropriate constitutional and statutory requirements in making her finding of necessity.

D. The Military Judge's Finding of Necessity

While we agree with Appellant that M.R.E. 611(d)(3) must be applied in a manner consistent with Craig, we disagree that the military judge failed to do so in this case. A military judge's finding of necessity is a question of fact that will not be reversed on appeal unless such finding is "clearly erroneous or unsupported by the record." Longstreath, 45 M.J. at 373. A military judge's application of M.R.E. 611(d) and Craig is a question of law that we review de novo. Daulton, 45 M.J. at 219; United States v. Sullivan, 42 M.J. 360, 363 (C.A.A.F. 1995).

Appellant argues that the military judge incorrectly applied M.R.E. 611(d)(3) in light of Craig because she found that CS would suffer fear and trauma from testifying in Appellant's presence, when it was clear from Ms. Prior's testimony that CS would suffer fear and trauma from testifying irrespective of Appellant's presence. While it is true that Craig requires the finding of necessity to be based on trauma resulting from the accused's presence, see Craig, 497 U.S. at 856 ("Denial of face-to-face confrontation is not needed to further the state interest

19

in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma."), Craig did not require that a child's trauma derive solely from the presence of the accused. Rather, it simply prohibited judges from considering trauma resulting from sources other than the accused in making a finding of necessity. Where the finding relates to fear, we read Craig and M.R.E. 611(d)(3) as imposing a similar restriction on a military judge's finding of necessity. Thus, so long as the finding is based on the fear or trauma caused by the accused's presence alone, it is irrelevant whether the child witness would also suffer some fear or trauma from testifying generally. A contrary reading would undermine the very interest the Court sought to protect in Craig.

In the present case, it is clear that CS was afraid of both testifying in open court and testifying in front of Appellant. Ms. Prior testified that it would be "stressful" for CS to testify in the courtroom, even if the accused were not present. However, when asked whether the harm would be aggravated if Appellant were present, she stated "extremely so." Moreover, Ms. Prior stated that CS was afraid that Appellant would beat her if she told anyone about the abuse. In addition, the military judge asked Ms.

Prior a series of questions to clarify the sources of the potential trauma to CS and to ensure that the trauma would be the product of Appellant's presence. Under these circumstances, there was sufficient evidence for the military judge to conclude that the fear or trauma, brought on by CS's fear of Appellant alone, would have prevented CS from reasonably testifying.

Appellant also argues that the military judge erred by not questioning CS prior to making her ruling. We disagree. The Sixth Amendment does not require a military judge, as a matter of course, to interview or observe a child witness prior to allowing the child to testify outside of an accused's presence. In Craig, the Supreme Court stated:

> Although we think such evidentiary requirements could strengthen the grounds for use of protective measures, we decline to establish, as a matter of federal constitutional law, any such categorical evidentiary prerequisites for the use of the one-way television procedure. The trial court in this case, for example, could well have found, on the basis of the expert testimony before it, that testimony by the child witnesses in the courtroom in the defendant's presence "will result in [each] child suffering serious emotional distress such that the child cannot reasonably communicate[.]"

497 U.S. at 860 (quoting Md. Code Ann. Cts. & Jud. Proc. § 9-102(a)(1)(ii)(1989)) (emphasis added).

21

Neither do we conclude that M.R.E. 611(d) require a military judge to interview a child witness before ruling on a motion for remote live testimony. The language of M.R.E. 611(d) requires a "finding on the record," without any specific evidentiary prerequisites. While it may be appropriate, and even necessary, in some circumstances for a military judge to question or observe a child witness before ruling that he or she may testify outside of an accused's presence, such action is not required per se. Rather, a proper finding may be based on unrebutted expert testimony alone, if such testimony provides the military judge with sufficient information.

In this case, Ms. Prior provided the military judge with sufficient expert-opinion evidence to make a finding as to whether CS would suffer trauma and be unable to testify in Appellant's presence. Appellant does not dispute before this Court that Ms. Prior was an expert in the field of diagnosing and treating child sexual abuse victims. Ms. Prior was well acquainted with CS, having met with her 11 or 12 times. She had also observed changes in CS's behavior during the trial. Upon this basis, Ms. Prior was able to conclude that CS was afraid of Appellant and would be traumatized if forced to testify in front of him. Moreover, both parties and the military judge had the

22

opportunity to extensively probe the basis of Ms. Prior's conclusions. Under these circumstances, the military judge was not required to question CS or observe her before ruling on the Government's motion.

Appellant next maintains that "the 'fear' that the military judge found existed--that Appellant would beat CS--was unreasonable," as there was no immediate danger to CS from testifying in Appellant's presence. Appellant's argument, however, misconstrues M.R.E. 611(d)(3)(A). That provision does not require a finding that a child fear imminent harm from the accused. Nor does the rule require that the fear be reasonable. It provides that the fear of the accused be of such a nature that it prevents the child from being able to testify in the accused's presence. Ms. Prior testified, without objection, that CS was afraid Appellant would beat her if she told anyone about the abuse and that that fear would interfere with CS's ability to reasonably testify.

In his final argument, Appellant asks us to find that the military judge's finding of trauma was erroneous in two respects. Appellant contends that her finding that CS would be "traumatized" is insufficient to determine whether the level of trauma was more than de minimis as required by Craig. Second, Appellant implies that the facts do not

23

support a conclusion that the trauma to CS would be more than de minimis. Again, we disagree with Appellant.

As to Appellant's first concern, we agree with the lower court that in making her findings, the military judge clearly took into account the requirement that the trauma be more than de minimis. She, therefore, made her findings using the correct standard of necessity. We conclude that by using the word "traumatized," the military judge found more than de minimis trauma.

As to Appellant's factual argument, we conclude that there was an adequate factual basis for the military judge to conclude that CS would suffer more than de minimis trauma if compelled to testify in Appellant's presence. Ms. Prior stated that if CS testified, CS would "decompensate," her PTSD symptoms might recur, and she might regress in her treatment. She went on to add that the trauma would be "extremely" exacerbated if CS testified in Appellant's presence. Moreover, Ms. Prior testified that CS was afraid Appellant would beat her. Taken together, this testimony provides a sufficient basis for the military judge to conclude that CS would suffer trauma that would prevent her from reasonably testifying in Appellant's presence, and that this trauma would be more

24

than de minimis.  As a result, the military judge's finding of fact was not clearly erroneous.[2]

We therefore conclude that the military judge properly interpreted and applied M.R.E. 611(d) and Craig in making her finding of necessity.  We hold that the military judge did not clearly err in finding that CS would have been unable to testify in Appellant's presence under M.R.E. 611(d)(3)(A) because of CS's fear of Appellant.  Further, we note that although the military judge did not expressly rely on M.R.E. 611(d)(3)(B), her findings support a conclusion that CS would have been unable to testify in Appellant's presence due to the trauma caused by his presence.  Finally, the procedure implemented by the military judge properly protected other aspects of Appellant's right to confrontation.  The military judge ensured that Appellant was able to communicate with his counsel at all times during CS's testimony.  The military judge also required CS to testify in court, under oath, and in the presence of the fact-finder.  In addition, Appellant's counsel was able to cross-examine CS.  These

---

[2] That CS wanted to testify in Appellant's presence does not, by itself, establish that CS would have been able to reasonably testify in Appellant's presence.  On the facts of this case, the military judge was free, despite CS's desire, to defer to Ms. Prior's conclusion that CS would be harmed by testifying in front of Appellant in making her determination that CS would be unable to reasonably testify.  We cannot say this finding is clearly erroneous.

protections were sufficient to ensure the reliability of CS's testimony despite Appellant's absence.  We therefore hold that the military judge did not violate Appellant's Sixth Amendment right to confront a witness against him by allowing CS to testify outside of Appellant's presence.

Issue II: Marital Communications Privilege

A.   Factual Background

Appellant married RM in September 1991.  In 1996, RM's sister, MW, came to stay with the couple for one month during the summer.  MW was 14 years old at the time of the visit and was described by her mother as "mildly mentally retarded."  Because of MW's condition, RM saw to many of her sister's needs.

One morning, between 2:00 and 3:00 a.m., RM entered the living room and found Appellant and MW watching television.  Appellant was lying on the couch in his underwear, and MW was lying on the floor in her nightgown. The nightgown was "up above her waist," exposing her panties, and MW was rubbing her stomach.  The scene disturbed RM, but she eventually went back into her room and went to sleep.  Later that morning, RM asked MW whether anything had happened earlier with Appellant.  After some hesitation, MW became emotional and began to cry.  RM confronted Appellant in the bathroom, asking him whether he

had had sex with MW earlier that day. When he initially denied having sex with her, RM asked him, "[W]hy would she [(MW)] say that it happened[?]" Eventually, Appellant admitted to having had sex with MW, saying, "Yeah, okay."

RM and Appellant had several more confrontations about the event. No other people were present during the discussions. During one of these conversations, RM expressed her fear that MW might be pregnant. In response, Appellant told her that he did not ejaculate during the sexual encounter with MW. Out of fear that MW might be pregnant, RM took MW to a clinic for a pregnancy test.

Sometime thereafter, Appellant went to Saudi Arabia for several months on temporary duty. When Appellant returned home, the couple again discussed the incident with MW. RM testified that during one of these conversations, Appellant said that he "was trying to get his life together and trying to live right, and live better than he had been in the past. He had started reading the Bible a lot[.]" She further stated, "I just remember us having a conversation about him just trying to start over and you know take responsibility [for] the things he did in the past, and he mentioned telling my family about what happened and telling his, and you know, just taking responsibility for it." She also added that he

specifically wanted to tell his mother what had happened. In response, RM told Appellant that she did not want him to tell her family.

Defense counsel moved to suppress all of Appellant's statements made to RM on the ground that they were privileged marital communications. The Government opposed the motion, arguing that because RM "stood in loco parentis to [MW] at the time of the relevant events, . . . the exception to the marital privilege found in [M.R.E.] 504(c)(2)(A) should apply." In addition, the Government argued that the statements are admissible because they were intended to be disclosed to third parties and were therefore not privileged.

The military judge declined to extend the exception contained in M.R.E. 504(c)(2)(A) to this case, concluding that the exception was meant to apply narrowly. The military judge also held that Appellant's statement, "Yeah, okay," fell within the privilege and should be excluded. However, she determined that the other two statements were admissible. With regard to Appellant's statement that he did not ejaculate, the military judge determined that the defense had "failed to establish that this communication was 'privileged' as defined in M.R.E. 504(b)(2)." Rather, the military judge found that Appellant and his wife

intended to disclose the information to medical authorities to help them determine whether MW was pregnant. Finally, as to Appellant's statements made upon his return from Saudi Arabia, the military judge found that those statements were not intended to be confidential because Appellant intended to tell his mother and RM's family about his conduct with MW. She therefore granted the defense motion to suppress as to the first statement, but denied the motion as to the second and third statements.

Appellant was ultimately convicted of raping MW. He appealed his conviction to the Air Force Court of Criminal Appeals, arguing, among other things, that the military judge should have excluded all three statements pursuant to the marital communications privilege. See McCollum, 56 M.J. at 841. He maintained that he never intended to disclose any of the statements to third parties, nor did he give his wife permission to disclose the statements. Id. at 842.

The lower court affirmed the military judge's decision. The court held that because there was "some evidence" supporting the view that Appellant intended his statement about his not having ejaculated to be communicated to medical authorities, the military judge did not abuse her discretion by admitting it. Id. at 843.

29

Because the statement was subject to contrasting interpretations, the court determined that the "military judge obviously concluded that [A]ppellant did not meet his burden of proving the existence of the privilege." Id. Regarding Appellant's statements made to his wife after his return from Saudi Arabia, the court determined that although Appellant never actually disclosed the information to the families, he gave his wife consent to disclose the information and thus waived the privilege under M.R.E. 510(a). Id.

Appellant appealed his conviction to this Court, arguing that his statements to his wife were intended to be confidential marital communications and should have been excluded by the military judge under M.R.E. 504(b)(1). During oral argument before this Court, the issue of whether Appellant's statements were admissible under the exception contained in M.R.E. 504(c)(2)(A) again arose. Because this Court viewed that exception as potentially relevant in this context, it ordered supplemental briefs and additional oral argument on the applicability of M.R.E. 504(c)(2)(A) to this case.

Whether the military judge erred by admitting Appellant's two statements to his wife therefore depends on (1) whether Appellant's statements were privileged under

M.R.E. 504(b)(1); and (2) if so, whether the exception contained in M.R.E. 504(c)(2)(A) applies, making the statements admissible nonetheless.  We address both issues in turn.

B.   M.R.E. 504

   (1)  Discussion

A military judge's decision to admit or exclude evidence is reviewed for an abuse of discretion.  United States v. McElhaney, 54 M.J. 120, 132 (C.A.A.F. 2000); see United States v. Westmoreland, 312 F.3d 302, 306 (7th Cir. 2002)("We review the trial court's resolution of a marital privilege issue for an abuse of discretion.").  Whether a communication is privileged is a mixed question of fact and law.  McElhaney, 54 M.J. at 131 (citing United States v. Napoleon, 46 M.J. 279, 284 (C.A.A.F. 1997)).  We review a lower court's legal conclusions de novo, but we give a lower court's factual findings more deference, and will not reverse such findings unless they are clearly erroneous. United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995).

Courts have long held, either as a matter of statutory or common law, that confidential communications between a husband and wife made during a valid marriage are privileged and cannot be used as evidence in court, absent

31

waiver.  See, e.g., Wolfe v. United States, 291 U.S. 7, 15

(1934)(citing early cases recognizing a marital

communications privilege); 8 John Henry Wigmore, Evidence

in Trials at Common Law § 2333 (John T. McNaughton rev.

1961)(discussing the history and development of the marital

communications privilege).  In military law, the marital

communications privilege is contained in M.R.E. 504(b)(1).

The provision provides in relevant part:

> A person has a privilege during and after the
> marital relationship to refuse to disclose, and
> to prevent another from disclosing, any
> confidential communication made to the spouse of
> the person while they were husband and wife and
> not separated as provided by law.

The burden of establishing that a marital

communication is privileged under M.R.E. 504(b)(1) is on

the party asserting the privilege.  United States v.

McCarty, 45 M.J. 334, 336 (C.A.A.F. 1996); see 1

Christopher B.  Mueller & Laird C. Kirkpatrick, Federal

Evidence § 32, at 172-73 (1994)(noting that the party

bearing the burden of proof on privilege issues is the

party seeking to exclude evidence).  The party asserting

the privilege must establish its applicability by a

preponderance of the evidence.  See United States v.

Singleton, 260 F.3d 1295, 1301 (11th Cir. 2001)(requiring a

defendant asserting the marital privilege to prove by a

preponderance of the evidence that she and her husband were not permanently separated at the time of the allegedly protected communication); 1 Mueller & Kirkpatrick, supra, § 32, at 174 (noting that the preponderance standard applies to preliminary questions such as the application of privileges).  The same standard applies to M.R.E. 504(b)(1).  See Rule for Courts-Martial 905(c)(1).

In McElhaney, we summarized the requisite elements of a privileged communication under M.R.E. 504(b)(1): (1) there must be a communication; (2) the communication must have been intended to be confidential; and (3) it must have been made "between married persons not separated at the time of the communication."  54 M.J. at 131.  In Appellant's case, the parties agree that Appellant's statements were communications made to his wife while they were legally married and not separated.  The issue, therefore, is whether the two statements in question were intended to be confidential.

M.R.E. 504(b)(2) defines a confidential communication in the following terms:

> A communication is "confidential" if made privately by any person to the spouse of the person and is not intended to be disclosed to third persons other than those reasonably necessary for transmission of the communication.

33

In United States v. Peterson, 48 M.J. 81, 82 (C.A.A.F. 1998), we stated that a communication is confidential if there is (1) "physical privacy between the individuals," and (2) "an intent to maintain secrecy." Neither party in this case disputes that the communications between Appellant and RM were private and that no third party was present when Appellant made them. The parties, however, disagree about whether Appellant intended the communications to be secret.

From an evidentiary standpoint, proving that a party intended a communication to be confidential can be difficult. Such exchanges are often entirely oral, and the nature of confidential communications is such that there are rarely third parties or other evidence to attest to the facts. This difficulty is heightened in the marital context, where, because of the spousal relationship, there are rarely "express injunctions of secrecy," and the only evidence of intent may be the statement itself. 8 Wigmore, supra, § 2336, at 648. Moreover, in marriage, iterative processes of thought are shared, and not just conclusions and actions. For these reasons, the Supreme Court long ago held that "marital communications are presumptively

34

confidential."[3]  Blau v. United States, 340 U.S. 332, 333

(1951); see Pereira v. United States, 347 U.S. 1, 6 (1954);

Wolfe, 291 U.S. at 14 ; United States v. Byrd, 750 F.2d

585, 590 (7th Cir. 1984); In re Grand Jury Investigation,

603 F.2d 786, 788 (9th Cir. 1979); Caplan v. Fellheimer,

162 F.R.D. 490, 491 (E.D. Penn. 1995); 1 Charles T.

McCormick, McCormick on Evidence § 80, at 330 (5th ed.

1990); 8 Wigmore, supra, § 2336, at 648-56.  Therefore,

---

[3]     Although the M.R.E.s do not expressly address a presumption of confidentiality, it has been integral to the marital communications privilege since the early part of the twentieth century.  Moreover, it is clear that M.R.E. 504(b) is rooted in the common law marital communications privilege.  The analysis of M.R.E. 504(b) indicates that the present rule is based on the rule contained in paragraph 151(b)(2) of the Manual for Courts-Martial, United States, 1969 (Revised ed.). See Manual for Courts-Martial, United States (2002 ed.) [hereinafter MCM], Analysis of the Military Rules of Evidence A22-40.  The analysis of the 1969 rule, and the legal and legislative analysis of its 1951 predecessor, cite common law cases and commentators to explain the rule, indicating that the military rule is derived from common law. See Dep't of the Army, Pamphlet 27-2, Analysis of Contents, Manual for Courts-Martial, United States 1969 (Revised ed.) para. 151(b)(2), at 27-37 (1970)(citing Lutwak v. United States, 344 U.S. 604 (1953); Wolfe v. United States, 291 U.S. 7 (1934); and 8 John Henry Wigmore, Evidence in Trials at Common Law §§ 2298, 2310-11, 2317(1), 2322, 2328(1) (John T. McNaughton rev. 1961)); Legal and Legislative Basis, Manual for Courts-Martial, United States 1951 para. 151(b)(2), at 239 (1951 ed.)(citing 8 Wigmore, supra, §§ 2335, 2338(4)(1940 ed.) to clarify the application of the martial communications privilege and explain several exceptions to the privilege).
    The conclusion that there is a presumption of confidentiality is also consistent with M.R.E. 101(b), which instructs military courts, "if not otherwise prescribed in [the] Manual . . . , and insofar as practicable and not inconsistent with or contrary to the code or [the] Manual," to apply "the rules of evidence generally recognized in the trial of criminal cases in the United States district courts[.]"  The M.R.E.s do not address the application of presumptions generally, nor does M.R.E. 504(b) preclude the application of a presumption of confidentiality specifically.  Nor is such a presumption "inconsistent with or contrary to" the UCMJ or the MCM.  As such, we look to the rules of evidence that are generally recognized in the federal courts. As noted in the text, the federal courts that have addressed the issue have uniformly presumed marital communications to be confidential. Accordingly, we apply the same rule in this case.

once the party asserting the marital communications privilege establishes the existence of a private communication between spouses who are not separated, the burden of production shifts to the opposing party to overcome the presumption of confidentiality.  See Blau, 340 U.S. at 333-34 (holding that a statement was protected by the marital privilege where the Government failed to overcome the presumption of confidentiality); see also In re Grand Jury Investigation, 603 F.2d at 688 (noting that because marital communications are presumptively confidential, it is "necessary for the party seeking to avoid the privilege to overcome the presumption")(citing Blau, 340 U.S. at 333); Caplan, 162 F.R.D. at 491 (explaining that since "all communications made during a valid marriage are presumed to be confidential . . . the opposing party has the obligation of overcoming this presumption.").

Even though marital communications are presumed to be confidential, several factors are relevant in determining whether that presumption has been overcome.  For instance, the nature of the circumstances may suggest that the speaker did not intend the statement to be confidential. Wolfe, 291 U.S. at 14 ("[W]herever a communication, because of its nature or the circumstances under which it was made,

was obviously not intended to be confidential it is not a privileged communication."). A communication, for example, is generally not intended to be confidential if it is made in the presence of a third party. Id. The substance of the communication may also be indicative of whether the party intended a statement to be confidential. See Blau, 340 U.S. at 333 (acknowledging that a statement was likely intended to be confidential where a couple risked being put in jail for contempt of court for their actions). Because distinguishing between intent and a mere wish or desire is often difficult, the existence or nonexistence of an expressed timeline or particular plan for disclosure may also reveal whether a party intends to disclose information. This is particularly true if disclosure is said to be imminent. Finally, whether the statement is actually shared with a third party bears on whether the speaker intended the information to be confidential.

(2) Appellant's Statements Regarding Ejaculation

In the present case, the Court of Criminal Appeals upheld the military judge's admission of Appellant's statement regarding ejaculation. In doing so, it ultimately deferred to the military judge's conclusion that Appellant had failed to meet his burden of proving that he intended the statement to be confidential. However, this

conclusion ignores the general rule that marital communications are presumed to be confidential. Because Appellant had established that the statement was a private communication made to his wife while they were married, and not separated, it was left to the Government to rebut the presumption of confidentiality. Insofar as the military judge and lower court placed the burden of production on Appellant to prove confidentiality, they erred. The proper question is whether the Government overcame the presumption of confidentiality. Considering Appellant's statement and the circumstances surrounding its utterance, in light of the factors outlined above, we think that it did not.

Appellant's statement that he did not ejaculate is not the kind of statement a person generally intends to share openly. Further, Appellant likely knew that if authorities became aware of his actions, he risked being charged criminally. Moreover, the military judge's determination that Appellant intended the statement to be shared with medical authorities is without substantiation. There is no evidence that Appellant ever discussed sharing the information with medical authorities. In fact, RM could not be certain that Appellant even knew that she intended to take MW to a clinic. Nor did the statement itself contain any indication that Appellant intended to share the

38

information with medical personnel, but may have been uttered to dissuade RM from taking MW to the clinic. The military judge, therefore, clearly erred by finding that Appellant intended to share the information with medical personnel.

Finally, the fact that the statement was never shared until the investigation began supports the view that Appellant intended the statement to be confidential. There was no evidence produced at trial that either Appellant or RM ever discussed the incident with any third parties prior to the investigations that led to Appellant's trial. Appellant's mother testified that Appellant never told her about his conversations with RM. RM also testified that she never shared the information from these conversations with her family, family services, law enforcement personnel, or anyone on base. She also added that she never told the personnel at the clinic about the incident. Moreover, the Government did not introduce any medical records relating to MW's visit to the clinic.

Because we find no evidence that Appellant intended to share this statement with medical personnel, we hold that the Government failed to overcome the presumption of confidentiality. The military judge therefore abused her discretion by admitting the statement.

(3) Appellant's Post-Saudi Arabia Statements

The propriety of admitting Appellant's post-Saudi Arabia statements presents a more difficult question. The lower court held that Appellant waived any privilege by giving his wife consent to disclose his statement under M.R.E. 510(a). We disagree.

M.R.E. 510(a) states that a person waives a privilege where he or she "voluntarily discloses or consents to disclosure of any significant part of the matter or communication under circumstances that it would be inappropriate to allow the claim of privilege." Voluntary disclosure applies only where the speaker elects to share a substantial portion of a privileged communication with a party outside of the privileged relationship. McElhaney, 54 M.J. at 131-32; see United States v. Bahe, 128 F.3d 1440, 1442 (10th Cir. 1997); 2 Mueller & Kirkpatrick, supra, § 179, at 293. There is no evidence that Appellant did so here.

In our view, voluntary consent to disclose is given where one spouse either expressly or implicitly authorizes the other to share information with a third party. Courts have regularly held that the unauthorized disclosure of privileged information by one spouse does not constitute

waiver of the privilege.  In such cases, the nondisclosing spouse can still assert the privilege and prevent the use of the confidential information in a legal proceeding.  2 Mueller & Kirkpatrick, supra, § 207, at 438; see Proctor & Gamble Co. v. Banker's Trust Co., 909 F. Supp. 525, 528 (S.D. Ohio 1995), rev'd on other grounds, 78 F.3d 219 (6th Cir. 1996); United States v. Neal, 532 F. Supp. 942, 947 (Colo. 1982), aff'd, 743 F.2d 1441 (10th Cir. 1984); State v. Compton, 726 P.2d 837, 841 (N.M. 1986), cert. denied, 479 U.S. 890 (1986); People v. Gardner, 433 N.E.2d 1318 (Ill. App. Ct. 1982).

In Appellant's case, RM testified that Appellant told her that he "mentioned telling my family about what happened and telling his, and you know, just taking responsibility for it."  There is no evidence in these words, or otherwise, that Appellant either expressly or implicitly authorized his wife to share his statements with third parties.  Without more, his comments reflect a marital discussion about telling the families about Appellant's conduct with MW, not necessarily a decision to do so.  If discussing the possibility of sharing privileged information with third parties constituted authorization to disclose, an accused would have effectively waived the attorney-client privilege each time he discussed the

41

possibility of confessing with his attorney.  The facts here indicate that Appellant and RM merely discussed disclosure.  Therefore, Appellant did not waive the privilege provided for in M.R.E. 504(b)(1).

As M.R.E. 510(a) does not apply, again the question becomes whether the Government carried its burden of overcoming the presumption of confidentiality.  The military judge concluded that Appellant's expressed desire to tell his mother and his wife's family about the incident with MW manifested his intent to disclose the statements.  It is true that Appellant's statements could be interpreted as expressing an intention to disclose information to the families.  However, the statements could also be viewed as aspirational or an expression of desire, a view supported by the fact that the statements lacked any indication that disclosure was planned for a particular time.

Other factors also buttress the view that Appellant had not yet determined to disclose his relationship with MW with the families, but was addressing the possibility of doing so.  Similar to Appellant's other statements to RM, Appellant's post-Saudi Arabia statements contained information that is traditionally maintained as confidential.  Disclosure of Appellant's relationship with MW could have resulted in criminal or civil liability to

42

himself and could have traumatized the families. In fact, RM appears to have had this latter concern in mind when she counseled Appellant against disclosing his past conduct to her family. At trial she testified, "I told him I didn't want him telling, not my family." Further, this comment would seem to confirm that Appellant had not definitely decided to disclose the information at the time of his conversation with his wife. Furthermore, the view that Appellant intended the statements to be confidential is supported by the fact that neither party disclosed the information to family members. In short, there is no evidence he ever discussed the issue with the families or others.

Although there is some evidence, found in Appellant's words, supporting the view that Appellant wanted to tell others about his conduct with MW, we conclude that this evidence, when contrasted by evidence to the contrary, was insufficient to overcome the presumption of confidentiality. The Government therefore failed to carry its burden. We therefore hold that the military judge abused her discretion in concluding that Appellant's statements were not privileged under M.R.E. 504(b)(1).

C.   Applicability of M.R.E. 504(c)(2)(A).

Because Appellant's statements meet the requirements of M.R.E. 504(b)(1), they are privileged unless they otherwise fall under an exception to that rule. At issue in this case is the exception contained in M.R.E. 504(c)(2)(A), which applies to "proceedings in which one spouse is charged with a crime against the person or property of the other spouse or a child of either[.]" The Government argues that "child of either" should be read to include a "de facto" child, or a child who is under the care or custody of one of the spouses, regardless of the existence of a formal legal parent-child relationship. It therefore maintains that because MW was under the custody and care of RM at the time of the alleged offenses, MW was a de facto child and M.R.E. 504(c)(2)(A) should apply, making Appellant's statements admissible. Whether "child of either" should be construed to include a de facto child is a question of law that we review de novo. See United States v. Phillips, 18 C.M.A. 230, 234, 39 C.M.R. 230, 234 (1969)(construction of regulations is a question of law); United States v. Ramos-Oseguera, 120 F.3d 1028, 1042 (9th Cir. 1997)("A district court's construction of the Federal Rules of Evidence is a question of law subject to de novo review.")(citing United States v. Manning, 56 F.3d 1188, 1196 (9th Cir. 1995)).

44

We begin with the language of M.R.E. 504(c)(2)(A).  In construing the language of a statute or rule, it is generally understood that the "'words should be given their common and approved usage.'" United Scenic Artists v. NLRB, 762 F.2d 1027, 1032 n.15 (D.C. Cir. 1985)(quoting 2A Norman J. Singer, Sutherland Statutory Construction § 46.06, at 74 (4th ed. 1984)).  Although the term "child," by itself, has many definitions, when accompanied by the phrase "of either" in the context of a marital relationship, the word has more specific meaning.  The preposition "of," as used in this phrase, suggests derivation or belonging.  See Webster's New World College Dictionary 1000 (4th ed. 2000).  Thus the plain words suggest that a child should be considered "of" a spouse if that spouse is the parent (biological, adoptive or legally recognized parent or guardian) of the child in question.  Significantly, Black's Law Dictionary defines "parent" in terms of legal or biological status as

> "[t]he lawful father or mother of someone.  In ordinary usage, the term denotes more than responsibility for conception and birth.  The term commonly includes (1) either the natural father or the natural mother of a child, (2) the adoptive father or adoptive mother of a child, (3) a child's putative blood parent who has expressly acknowledged paternity, and (4) an individual or agency whose status as guardian has been established by judicial decree.

45

Black's Law Dictionary 1137 (7th ed. 1999).

It is possible to read the phrase "child of either" to suggest a custodial relationship, in addition to a legal or biological relationship where, for example, a child is placed under the long-term care of another without legal ratification. A child placed under the long-term care of a grandparent or other relative during an extended deployment might establish a sufficient sense of "belonging" to qualify as a de facto child of the guardian. This view of the rule's language, however, strikes us as strained in light of the general usage and understanding of these terms in legal practice. Moreover, the President could have drafted a fuller, more expansive definition to connote a custodial as well as legal or biological relationship. Given the significant social and legal policy implications of extending the privilege with respect to custodial relationships with children, we would expect such an intent to be represented in express language, rather than pressed or squeezed from the present text. Therefore, we think the better view is that "child of either," as used in M.R.E. 504(c)(2)(A), applies to only those situations in which a

child is the biological child of one of the spouses, the legally recognized child, or ward of one of the spouses.[4]

In reaching this conclusion, we are also cognizant that M.R.E. 101(b) instructs military courts to look to the federal rules and the common law for guidance on evidentiary issues where doing so is "not otherwise prescribed in [the] Manual . . . and insofar as practicable and not inconsistent with or contrary to the code or [the] Manual."  When looking to these sources, M.R.E. 101(b) mandates that we look

    (1)  First, [to] the rules of evidence generally
         recognized in the trial or criminal cases in
         the United States district courts; and
    (2)  Second, when not inconsistent with
         subdivision (b)(1), [to] the rules of
         evidence at common law.

An expansive interpretation of the phrase "child of either" finds little support in the federal civilian system or common law.

With regard to M.R.E. 101(b)(1), the Federal Rules of Evidence do not expressly provide for an exception to the marital communications privilege.  See Fed. R. Evid. 501.

---

[4] A foster child may indeed be a legally recognized child or ward of a spouse.  Because of variations in state laws and the number of other factors that might potentially come into play in cases involving foster children, we reserve the question of whether this exception applies specifically to foster children for a case in which that issue has been appropriately raised, briefed, and argued.

Moreover, we are aware of only one federal circuit that has recognized an exception to the common law marital communications privilege where a spouse is accused of abusing a child who is not the biological or legal child of either spouse.  See Bahe, 128 F.3d at 1444-46 (creating "an exception to the marital communications privilege for spousal testimony relating to the abuse of a minor child within the household").  While there is no mathematical or temporal formula for determining how many cases make an exception "generally recognized," we are confident it must be more than one.  Thus at this time, the rules of evidence applicable in the federal district courts do not generally recognize a de facto child exception to the marital communications privilege.

We also note that only five states have recognized an exception to the marital communications privilege for offenses against a child who is not the biological or adopted child of one of the spouses.  See Huddleston v. State, 997 S.W.2d 319, 321 (Tex. Ct. App. 1999)(holding that Tex. Crim. Proc. Code Ann. § 38.10 (Vernon Supp. 1999)) provides an exception to the marital communications privilege where a person is charged with a crime against any minor child, regardless of whether the child is a child of one of the spouses); Dunn v. Superior Court, 26 Cal.

48

Rptr.2d 365, 367-68 (Cal. Ct. App. 1993)(interpreting the phrase "child of . . . either" in an exception to the marital communications privilege to include a foster child); State v. Michels, 414 N.W.2d 311, 315-16 (Wis. Ct. App. 1987)(concluding that the phrase "child of either" as used in an exception to the husband-wife privilege was intended to include a foster child); Daniels v. State, 681 P.2d 341, 345 (Alaska Ct. App. 1984)(holding that the language "'child of either' is sufficiently broad to apply to a crime committed against a foster child."). Even among these states, only Texas's exception in Huddleston would clearly extend to children in the home that do not have some type of legal relationship with one of the spouses.

Based on the text of the rule, and in light of the rules of evidence generally recognized in the federal courts, we conclude that there is not a de facto child exception to the marital communications privilege of M.R.E. 504(c)(2)(A). We also conclude that MW was not a child of RM or Appellant for purposes of M.R.E. 504(c)(2)(A) during her month-long stay with the couple.

MW is RM's sister. While RM cared for MW and saw to her needs, MW only stayed with Appellant and RM for one month, after which time she returned to her parent's home. Moreover, there was no evidence that RM had any parental

49

rights or duties over MW by virtue of law or decree.[5]  Based
on the lack of evidence to the contrary, we conclude that
MW was not the "child" of either RM or Appellant because
there was no biological and/or legal parent-child
relationship.  The exception contained in M.R.E.
504(c)(2)(A) therefore does not apply to this case.

Whether a de facto child exception to the marital
communications privilege should apply to courts-martial is
a legal policy question best addressed by the political and
policy-making elements of the government.[6]

---

[5]  We note that the Government offered no evidence on appeal or at trial
to indicate that a legal child-parent relationship existed during MW's
month-long stay with RM.  Insofar as the Government failed to introduce
any evidence of such a relationship, it should bear the consequences of
such a failure.

[6]  Consideration of such an exception would require the careful weighing
of complicated and often contrasting policy concerns.
   On the one hand, "de facto child" does not offer the same degree
of clarity in coverage as definitions based on legal connections.  As
recognized by Judge Everett in United States v. Tipton, 23 M.J. 338,
343 (C.M.A. 1987), there are good arguments for adopting crisp rules of
privilege and exceptions that are as clear to the lay person as they
are to the lawyer in a system of justice integrally incorporating both.
Clear rules also underpin the policy purpose behind the marital
communications privilege in the first instance.  As a matter of theory,
certainty in coverage encourages marital communication and, through
communication, the marital bond.  The marital bond, in turn, is
generally recognized as facilitating the nurture and protection of
children within the family.
   On the other hand, there are good policy justifications for
expanding the exception to the privilege to include a de facto child,
particularly in the military.  Due to deployments and single
parenthood, children of military personnel are often cared for by
grandparents, siblings, aunts or uncles, or friends.  We also recognize
that many children are abused in homes that are not their own.
Moreover, we are aware that there are a myriad of child-raising
scenarios in today's society, often necessitating daycare or less
formal means of supervising children.  Children in these situations
should receive no less protection from abuse than they receive in their
own homes.  One could also argue that the marital communications

50

Because M.R.E. 504(c)(2)(A) does not apply in this case, Appellant's statements to RM were privileged and should have been excluded from trial. Such error will require reversal unless the error is harmless.

## Harmless Error

Whether an error, constitutional or otherwise, was harmless is a question of law that we review de novo. United States v. Walker, 57 M.J. 174, 178 (C.A.A.F. 2002); United States v. Grijalva, 55 M.J. 223, 228 (C.A.A.F. 2001). The Government has the burden of persuading us that a constitutional error is harmless beyond a reasonable doubt. United States v. Hall, 56 M.J. 432, 436 (C.A.A.F. 2002). For nonconstitutional errors, the Government must demonstrate that the error did not have a substantial influence on the findings. Walker, 57 M.J. at 178 (citing Kotteakos v. United States, 328 U.S. 750, 765 (1946)).

This Court has never addressed whether the erroneous admission of privileged marital communications constitutes constitutional or nonconstitutional error for purposes of harmless error analysis. With respect to the privilege in

---

privilege--a privilege intended to promote marital harmony--should not prevent "a properly outraged spouse with knowledge from testifying against the perpetrator" of child abuse within the home, regardless of whether the child is part of that family. United States v. Bahe, 128 F.3d 1440, 1446 (10th Cir. 1997).

In any event, it is the responsibility of the political elements of government to balance these competing considerations in law.

51

this case, constitutional concerns are not at issue.

M.R.E. 504 was formulated by the Evidence Working Group of the Joint Service Committee on Military Justice and was enacted by presidential order.  See United States v. Martel, 19 M.J. 917, 931 (A.C.M.R. 1985); MCM, Drafter's Analysis, supra, at A22-38, A22-40.  It was not constitutionally mandated, and consequently, any error in admitting privileged spousal communications must be nonconstitutional in nature.  Therefore, the military judge's error in admitting Appellant's privileged statements will be harmless if the error did not have a substantial influence on the findings.

In determining the prejudice resulting from the erroneous admission of evidence, we weigh "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."  United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F. 1999)(citing United States v. Weeks, 20 M.J. 22, 25 (C.M.A. 1985)).  Applying this standard to Appellant's case, we hold that the military judge's error in admitting Appellant's statements was harmless.

On the one hand, there is no doubt that Appellant's privileged statements were material.  They directly related

to Appellant's culpability, an ultimate issue in this case. Moreover, the statements were of good quality. While they were not extensive, the statements were admissions of guilt and provided sufficient detail to make their meaning clear.

On the other hand, other factors indicate that the erroneous admission of the statements did not have a substantial influence on the findings. See Kotteakos, 328 U.S. at 765. The Government presented strong evidence that Appellant had sexual intercourse with MW. MW testified that Appellant had had sex with her on multiple occasions in different places throughout the house. She described at least two of these occasions in graphic detail. In the first instance, despite her mental limitations, MW was able to identify the room in which Appellant had sex with her and what she was wearing, explain what Appellant said to her, and describe the sexual encounter, including that following the encounter, Appellant "wiped the stuff off. He had took [sic] a towel and had wiped the white stuff off of him." She also testified that after having sex, she went and cleaned the "white stuff" off of herself because she didn't want to "get pregnant." Regarding a second instance, MW testified to the following facts: (1) Appellant had sex with her in the living room; (2) RM and her niece were asleep at the time; (3) she was wearing a

53

nightgown; (4) Appellant asked her if he could have sex with her; (5) she took off her panties and Appellant took off his clothes; (6) when they were naked, Appellant inserted his penis in her; and (7) after Appellant was done, he again "wiped the white stuff off of him."

Moreover, MW's testimony was uncontradicted on cross-examination. During cross-examination, defense counsel did not question MW about the facts she testified to on direct. Rather, defense counsel attempted to show that MW's testimony was the result of her suggestibility. Defense counsel was able to establish that MW was confused about the existence of a second written statement, but he failed to mount any evidence to support the theory that MW's testimony was untrue.

MW's testimony was supported by RM's testimony. RM testified that she awoke one morning between 2:00 and 3:00 a.m. to find Appellant lying in the living room in his underwear near MW. She stated that MW's nightgown was pulled up above her waist, exposing her panties. RM further testified that when she confronted MW the next morning about the events of the prior evening, MW became emotional and began to cry. Subsequently, in a confrontation with Appellant about whether he had had sex with MW earlier that morning, and in response to

54

Appellant's denying such action, RM testified that she asked him, "why would [MW] say that it happened[?]"  RM also testified that some time after this incident, she took MW to a clinic to see whether she was pregnant.  When considered in light of MW's testimony, these facts demonstrate that the Government had a strong case against Appellant.

The defense's case, on the other hand, was weak.  It's primary theory, as evidenced by its opening and closing statements, was that all the prosecution's witnesses' stories were inconsistent, confusing, or fabricated.  Yet, defense counsel failed to undermine the substance of MW's or RM's testimony, for example, through cross-examination. Defense counsel also failed to raise any material inconsistencies in their stories.  Moreover, although defense counsel insinuated that RM's and MW's testimony was false or the product of suggestion, he was unable to offer any proof to substantiate such allegations.

Although the qualitative nature of Appellant's statements makes resolution of this issue a close one, we conclude that the other evidence against Appellant was sufficiently incriminating that Appellant would have been convicted even if his statements had been properly excluded.  We therefore hold that the military judge's

erroneous admission of those statements did not substantially influence her findings.  The errors were therefore harmless.

## Conclusion

For these reasons, we affirm the decision of the Air Force Court of Criminal Appeals.

CRAWFORD, Chief Judge (concurring in the result):

I agree with the majority's resolution of this case on the ground of harmless error.  I write separately because my analysis of whether "child of either" in the context of Military Rule of Evidence 504(c)(2)(A) [hereinafter M.R.E.] includes a de facto child, leads me to a different conclusion than the majority.

While the plain or ordinary meaning is certainly the starting point for statutory interpretation, courts should also implement "considerations of language, purpose, and administrative workability[.]"  Geier v. American Honda Motor Co., 529 U.S. 861, 873 (2000).  Accordingly, "it is entirely appropriate to consult all public materials, including . . . the legislative history . . . to verify that what seems to us an unworkable disposition . . . was indeed unthought of, and thus to justify a departure from the ordinary meaning of [a] word[.]"  Green v. Bock Laundry Machine Co., 490 U.S. 504, 527 (1989)(Scalia, J., concurring).  See also Mississippi Band Choctaw Indians v. Holyfield, 490 U.S. 30, 43 (1989)(applying congressional intent to statutory interpretation).  "These factors provide a background of the existing customs, practices, and rights and obligations against which to read the

statute." United States v. Tardif, 57 M.J. 219, 226 (C.A.A.F. 2002)(Crawford, C.J., dissenting).

The explicit public policy concerns prompting the military's adoption of M.R.E. 504(c)(2)(A) suggest that the term "child of either" includes a de facto child. To find otherwise is simply an "unworkable disposition" that, while justifiable under the plain meaning of the word "child," defeats a key purpose for which the exception was adopted.

In 1969, the Judicial Conference of the United States, Committee on Rules of Practice and Procedure, promulgated a draft of the Proposed Federal Rules of Evidence -- the precursor of today's Federal Rules of Evidence. Proposed Fed. R. Evid. 5-05(b)(1) established an exception to the husband-wife privilege "in proceedings in which one spouse is charged with a crime against the person or property . . . of a child of either[.]" 46 F.R.D. 161, 263 (1969). The note to the proposed rule identified the "need of limitation upon the privilege in order to avoid grave injustice in cases of offenses against . . . a child [of either spouse.]" Id. at 265 (emphasis added). Proposed Fed. R. Evid. 5-05(b)(1) became, verbatim, Proposed Fed. R. Evid. 505(c)(1) in the 1971 Revised Draft of the Proposed Rules, which included the same explanatory note. 51 F.R.D. 315, 369, 371 (1971).

Although Congress did not include the Proposed Rule 505(c)(1) exception in the eventually codified Federal Rules of Evidence, the military did expressly include the exception in the form of M.R.E. 504(c)(2)(A).  That the military elected to identify this exception explicitly, despite Congress's failure to do so in the Federal Rules of Evidence, is significant.  The analysis of M.R.E. 504(c)(2)(A) notes its adoption from proposed Fed. R. Evid. 505(c)(1), and highlights the rule's recognition of "society's overriding interest in prosecution of anti-marital offenses and the probability that a spouse may exercise sufficient control, psychological or otherwise, to be able to prevent the other spouse from testifying voluntarily."  Manual for Courts-Martial, United States (2002 ed.), Analysis of the Military Rules of Evidence A22-40.

What we glean from the history of M.R.E. 504(c)(2)(A) and its analysis is an intent to effect public policy.  Clearly, an important public policy behind this exception is "the interest in protecting children, which abounds in the law" Dunn v. Superior Court, 26 Cal. Rptr. 2d 365, 367 (Cal. Ct. App. 1993) (interpreting the "child of either" language in California's exception to the marital privilege).  This interest strongly signals that "child of

3

either" encompasses a de facto child.  To find otherwise would yield absurd results.  Clearly, the exception's purpose

> would not be served by affording protection to only those children of a family unit with legal or biological relationships.  Rather, [the purpose] is to ensure that those individuals, particularly minor children, who are present in the home and are actively a part of the family structure are protected, via criminal prosecution, for crimes committed against them.

State v. Michels, 414 N.W.2d 311, 316 (Wis. Ct. App. 1987)(emphasis added).[1]

While the majority may be correct that this issue ultimately is "a legal policy question best addressed by the political and policy-making elements of the government," __ M.J. (50), the Court is remiss to ignore the explicit public policy incentives behind the military's adoption of M.R.E. 504(c)(2)(A).

---

[1] Several states which, like the military, have adopted the proposed Fed. R. Evid. 505(c)(1) exception have employed this reasoning and applied exactly this interpretation of "child of either."  See Daniels v. State, 681 P.2d 341 (Alaska Ct. App. 1984) (holding that the phrase is sufficiently broad to include crimes committed against foster children, in the interest of protecting children); Dunn v. Superior Court, 26 Cal. Rptr. 2d 365, 367 (Cal. Ct. App. 1993) (interpreting the phrase to include foster children, in the paramount interest of protecting children); Huddleston v. State, 997 S.W.2d 319, 321 (Tex. Ct. App. 1999)(holding that the exception to the spousal privilege applies when a crime is committed against any minor child even if the defendant or spouse is not the parent of the child); State v. Michels, 414 N.W.2d 311, 315-16 (Wis. Ct. App. 1987)(applying the rule's "object to be accomplished" in concluding that a "foster child is properly included").